UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/1/2021

------------------------------------------------------------ X

JOHN DOE,

        Plaintiff,

    -against-

COLUMBIA UNIVERSITY,

        Defendant.

------------------------------------------------------------ X

1:20-cv-06770-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, District Judge:

  Plaintiff John Doe and Jane Does 1–4 were all students at Defendant Columbia University in the City of New York.  During the course of Plaintiff's senior year, each of Jane Does 1–4 filed complaints alleging that Plaintiff had sexually assaulted them in violation of Columbia's Gender-Based Misconduct Policy.  In response to each of those complaints, Columbia began a disciplinary process against Plaintiff.  Because Plaintiff was a member of the student government and one of the Jane Does was a member of a student group advocating for Columbia to take sexual assault on campus more seriously, a campus news site published an article about the complaints.  After the third complaint was filed, Columbia—without giving Plaintiff notice or a hearing—placed him on an interim suspension.  Plaintiff filed a counter-complaint against Jane Doe 1 for sexual misconduct and against Jane Does 1–3 for harassment and retaliation, which Plaintiff alleges Columbia failed to investigate.  In the midst of those disciplinary proceedings, Plaintiff was expelled from Columbia for email hacking.  Ultimately, following his expulsion, Columbia found that Plaintiff had violated its Gender-Based Misconduct Policy with respect to Jane Doe 1, Jane Doe 3, and Jane Doe 4.  Plaintiff was found not responsible with respect to Jane Doe 2.

Plaintiff challenged his expulsion for email hacking and the Jane Doe 1 and 4 proceedings in Article 78 actions in state court.  He was unsuccessful.  Plaintiff then filed this lawsuit, bringing seven claims under Title IX of the Education Amendments of 1972.

The crux of Plaintiff's Title IX claims is that Columbia discriminated against him because of his gender in imposing the interim suspension and in investigating and adjudicating the complaints filed by Jane Does 1, 3, and 4.  Plaintiff seeks injunctive relief—that his disciplinary record be expunged and that he be given a diploma—and damages.  Because Plaintiff was independently expelled for email hacking, his claims for injunctive relief are not fairly traceable to the gender-based misconduct proceedings he challenges here, and he does not have standing to seek that injunctive relief.  And because Plaintiff has not alleged the existence of a similarly situated student who was treated better than he in the context of his interim suspension, his selective enforcement claim challenging the interim suspension also fails.  Plaintiff has not alleged that he was sexually harassed, so he has not stated a deliberate indifference claim.  Furthermore, Plaintiff is collaterally estopped from pursuing an erroneous outcome claim as to the Jane Doe 1 proceeding.  Accordingly, Defendant's motion dismiss is GRANTED as to Plaintiff's claims for injunctive relief and damages arising from his expulsion and lack of diploma, Plaintiff's selective enforcement and *Davis* harassment claims regarding his interim suspension, and Plaintiff's erroneous outcome claim as to the Jane Doe 1 proceeding.

But Plaintiff has alleged procedural defects that may have affected the outcome of the disciplinary proceedings regarding both his interim suspension and the Jane Does 1, 3, and 4 complaints.  Plaintiff has also alleged circumstances giving rise to a plausible inference of discriminatory intent by Columbia.  Accordingly, Plaintiff has stated erroneous outcome claims with respect to the Jane Does 3 and 4 proceedings and his interim suspension.  And Plaintiff has stated a selective enforcement claim with respect to the Jane Doe 1 complaint because he and Jane Doe 1

were similarly situated, and Columbia treated Jane Doe 1 better than Plaintiff.  While Columbia investigated Jane Doe 1's complaint for sexual assault, it failed to investigate his counter-complaint against Jane Doe 1 for sexual misconduct and sexual exploitation.  Accordingly, Defendant's motion to dismiss is DENIED as to all other claims.

## I. BACKGROUND

### A. Facts

Plaintiff John Doe ("Plaintiff") was a student at Defendant Columbia University in the City of New York ("Defendant" or "Columbia").  Compl., Dkt. No. 14 ¶¶ 6–7.  During the 2017–2018 school year, Plaintiff was named as a respondent in multiple complaints alleging that he had violated Columbia's Gender-Based Misconduct Policy.

#### 1.  Columbia's GBM Policy

Columbia's Gender-Based Misconduct Policy prohibits non-consensual sexual conduct, including "Sexual Assault:  Intercourse," "Sexual Assault:  Contact," "Dating Violence," "Sexual Exploitation," "Gender-Based Harassment," and "Sexual Harassment."  Defs.' Br. in Supp. Ex. A (the "GBM Policy" or the "GBM") at 4–6.  It also prohibits retaliation against someone who has reported a gender-based misconduct complaint or has been the subject of a gender-based misconduct complaint.  *Id.* at 7.

The GBM Policy outlines the procedures for investigating and resolving complaints of gender-based misconduct.  When Columbia's Gender-Based Misconduct Office (the "GBM Office") receives a report of a violation, it "conducts an initial assessment to evaluate whether, if substantiated, the conduct constitutes a Policy violation and whether there is a reasonable basis to engage in the disciplinary process."  *Id.* at 21.  After a report is made, "[t]he University may also take interim measures to ensure the safety of all parties involved and to protect the integrity of the ongoing disciplinary process."  *Id.* at 21.

In the investigation process, Columbia "will designate a two-person team . . . to conduct an investigation into whether a violation of the Policy occurred." *Id.* 25.  The investigative team "will speak to each party in detail about the allegation(s) and ask each party to provide a list of witnesses and/or any relevant documents or evidence to be considered." *Id.* at 25.  The team "has the discretion to determine the relevance of any proffered witness and/or evidence and determine that certain witnesses and/or evidence should be included or excluded in the investigative process in light of the allegations and/or Policy set out here." *Id.*   At the conclusion of the initial phase of the investigation, the investigative team "will provide to the Complainant and the Respondent, in writing, a Notice of Final Charges, which will include a description of the alleged Policy violation(s) that will be considered during the hearing process, if applicable." *Id.* at 27.  The investigative team "will then prepare a report based on interview summaries, witness statements and other documents gathered during the investigation" and "will provide a redacted and watermarked copy of the report to the Complainant, Respondent, and/or their respective advisors for their review." *Id.*  The parties may respond to the report's factual summary, provide additional information, and challenge its factual accuracy.  *Id.* at 27.  Throughout the process, students are entitled to an advisor, and may submit questions for the investigative team to pose to others as part of the investigation.  *Id.* at 17, 27.

After the investigative team prepares its final report and makes a responsibility determination with respect to each party, either party may request a hearing.  *Id.* at 28.  The hearing panel then evaluates all relevant information in the investigative report and determines, based on a preponderance of the evidence, whether a GBM Policy violation occurred.  *Id.*  If the hearing panel finds a student responsible, the matter proceeds to a sanctions phase.  *Id.* at 31.  Either party may appeal the hearing decision, the sanction, or both.  *Id.*

### 2. The Environment at Columbia

Plaintiff makes many allegations regarding Columbia's gender bias.  The Court will highlight the ones that are most significant in the Court's analysis.  Plaintiff alleges that the GBM complaints at issue here and Columbia's investigation and resolution of those complaints took place against a backdrop of pressure on Columbia to take sexual assault more seriously and to crack down on perpetrators of sexual assault on campus.

In 2014, Emma Sulkowicz's visual arts senior thesis *Mattress Performance (Carry That Weight)* "brought the scrutiny of national media" to Columbia's handling of sexual assault on campus. Compl. ¶ 104.  Plaintiff alleges that this was a "particularly fraught moment in the conversation regarding campus sexual assault at Columbia."  One of the student groups putting pressure on Columbia to tighten its sexual assault policies was called "No Red Tape."  Ms. Sulkowicz said, "[i]t frustrates me that No Red Tape, the Coalition Against Sexual Violence, and so many other people are working our butts off to create as comprehensive a set of policy changes as we can—which we gave to the Columbia administration—but they haven't listened to us." *Id.* ¶ 103 n.96.  Plaintiff alleges that in the wake of that moment, Columbia was "eager to indulge" the opinions of campus activists. *Id.* ¶ 104.

Plaintiff alleges that this pressure did not let up.  In March of 2017, No Red Tape requested that Columbia "change their gender-based misconduct policy." *Id.* ¶ 103.  Columbia "acquiesced just three months later." *Id.*  Plaintiff alleges that "Columbia submitted to pressure in 2017–2018 from #MeToo and N[o] R[ed] T[ape]." *Id.*

### 3. GBM Incidents, Complaints, and Counter-Complaints

Four GBM complaints were filed against Plaintiff during the 2017–2018 school year, when Plaintiff was a senior at Columbia.  Compl. ¶ 106.  Between December 2017 and March 2018, each of Jane Does 1–4 filed separate complaints alleging that Plaintiff had engaged in various types of

sexual misconduct in violation of the GBM.  *Id.* ¶¶ 113, 118, 130, 133.  During that time, Plaintiff also filed a counter-complaint against Jane Doe 1 for sexual misconduct and sexual exploitation, and a counter-complaint against Jane Does 1–3 for harassment and retaliation.  *Id.* ¶¶ 119, 132, 147.

### a. Jane Doe 1

In the early morning hours of December 13, 2017, Plaintiff met Jane Doe 1 at a fraternity party.  *Id.* ¶ 107.  They left the party together.  *Id.*  Plaintiff was heavily intoxicated when he left the party, and initially did not remember anything until "waking up in someone else's bed without memory of with whom he was in bed, where he was, and that he left and returned to his room in his residence hall."  *Id.* ¶ 109.

Later that morning, Jane Doe 1's roommate sent Jane Doe 1 a text message asking if Jane Doe 1 had "hooked up" with Plaintiff.  *Id.* ¶ 111.  Jane Doe 1 responded "yeah but it was so bad lmao."  *Id.*  Her roommate asked, "Was he too drunk lol;" Jane Doe 1 responded, "No it was just questionably non-consensual at points on my end."  *Id.*  Jane Doe 1 texted a different friend about the encounter as well, stating that she "hooked up with this idiot beta man last night. and it turned non-consensual on my end at the end bc it was painful and bad and was going on forever and he didn't use a condom?  which i knew but also wtf and i think he finished?"  *Id.*  Jane Doe 1 wrote, "i'm okay i'm just mad at myself also for not being more assertive when i was saying stop" and, "i wasn't very loud but i was like literally squirming away."  *Id.*

That day, Jane Doe 1 asked a friend who knew Plaintiff to find out what Plaintiff knew about what had happened during their encounter.  *Id.* ¶ 112.  Plaintiff told Jane Doe 1's friend that he could only remember having too many drinks and waking up next to a stranger.  *Id.*  Jane Doe 1's friend accused Plaintiff of raping Jane Doe 1, but Plaintiff denied the accusation because he did not recognize Jane Doe 1's name and did not have any memory of a sexual encounter.  *Id.*  The friend returned to Jane Doe 1's dormitory and told her and her friends what Plaintiff had told him.  *Id.*

Jane Doe 1 brought a gender-based misconduct complaint against Plaintiff. *Id.* ¶ 113. She alleged that after meeting Plaintiff, she had decided to have sex with Plaintiff and that during the sexual encounter, she had withdrawn her consent. *Id.* Jane Doe 1 recounted that she and Plaintiff went to her residence hall on campus together. *Id.* ¶ 108. There, Plaintiff, Jane Doe 1, and Jane Doe 1's roommate talked in the living room. *Id.* After Jane Doe 1's roommate left the living room, Plaintiff kissed Jane Doe 1 and she led Plaintiff up to her room. *Id.* Jane Doe 1 recounted that Plaintiff then went to take a shower, but she could not recall how long the shower lasted. *Id.* ¶ 110. After the shower, Jane Doe 1 and Plaintiff proceed to make out, and Plaintiff performed oral sex on Jane Doe 1 for "a few seconds or maybe a minute." *Id.* Plaintiff then had sexual intercourse with Jane Doe, at which point Jane Doe 1 said, "Ow Ow Ow" and asked Plaintiff to "stop." *Id.* Plaintiff acted as if he had not heard her and continued to engage in sexual intercourse. *Id.* At 6:30 a.m. that morning, Jane Doe 1 tapped Plaintiff's shoulder and asked him to leave; Plaintiff left. *Id.* On December 27, 2017 Plaintiff was informed of Jane Doe 1's complaint. *Id.* ¶ 114.

When Plaintiff returned to campus after winter break, he asked around to gather information about the encounter. *Id.* Plaintiff alleges that these conversations "trigger[ed] more of a recollection of the early hours of December 13." *Id.* At that time, he was able to recall that "he shared an Uber, that he had been led around by someone, had sat next to two people in a living room . . . , had used the bathroom once with great difficulty, had kissed Jane Doe [1], had engaged in oral sex and had erectile disfunction." *Id.* Jane Doe 1 had discussed her complaint with members of Plaintiff's fraternity with whom she was friends and asked them to "oust" Plaintiff or demand his resignation from the fraternity. *Id.* ¶¶ 114, 117. On January 25, 2018, Plaintiff offered his resignation. *Id.* ¶ 117. That day, Columbia also began its investigation of Jane Doe 1's allegations. *Id.*

On January 29, 2018, Plaintiff filed a counter-complaint of gender-based misconduct against Jane Doe 1, alleging that Jane Doe 1 had committed sexual misconduct on December 13, 2019,

because Plaintiff had been too incapacitated from alcohol to consent to sexual conduct. *Id.* ¶ 119. On February 26, 2018, Plaintiff amended his complaint against Jane Doe 1 to add a charge of sexual exploitation because he remembered being given an alcoholic drink in Jane Doe 1's living room despite his intoxicated state. *Id.* ¶ 150. On April 10, 2018, Columbia informed Plaintiff that it would not add a charge of sexual exploitation to Plaintiff's counter-complaint against Jane Doe 1 because Plaintiff's allegations were insufficient to support the charge. *Id.*

On April 20, 2018, Columbia provided Plaintiff with a draft of the investigation report concerning Jane Doe 1's allegations. *Id.* ¶ 148. Plaintiff expressed "his concerns about conflicts of interest among the investigators who appeared to be ignoring the concocted nature of the story told by Jane Doe 1 and her friends." *Id.*

On May 1, 2018, Plaintiff objected to Columbia's decision not to add a charge of sexual exploitation to Plaintiff's counter-complaint against Jane Doe 1. *Id.* ¶ 150. Plaintiff alleges that Columbia "did not ask [Jane Doe 1] a single question regarding [John Doe]'s Sexual Exploitation charge before dismissing its consideration from [John Doe]'s complaint." *Id.* (alterations in original) He wrote:

> On the one hand, your office has claimed that [John Doe]'s allegations are insufficient to support the charge, yet, Columbia maintains that it did not investigate the allegations and that [Jane Doe 1] was not required to provide a response to [John Doe]'s Sexual Exploitation charge . . . . Columbia has failed to discharge even a cursory investigation into [John Doe]'s charges against [Jane Doe 1] for Sexual Exploitation.

*Id.* (alterations in original).

### b. Jane Doe 2

Plaintiff and Jane Doe 2 had some sort of ongoing relationship—Plaintiff characterizes the relationship as a "hook-up relationship" but also describes Jane Doe 2 as his "ex-girlfriend"—that lasted from fall 2015 to mid-April 2016. *Id.* ¶ 115. Plaintiff alleges that their breakup "upset" Jane Doe 2. *Id.* In January 2018, Plaintiff and Jane Doe 2 enrolled in the same physics class. *Id.*

At some point, Jane Doe 2 sent an email to the Title IX office, alleging that Plaintiff had raped her, asking that her allegations be investigated, and requesting that she and Plaintiff not be enrolled in the same physics class. *Id.* ¶ 116.  On January 23, 2018, Jane Doe 2 met with Columbia's Title IX Coordinator and Associate Vice President Marjorie Fisher. *Id.* ¶ 116.  Ms. Fisher filed a complaint on behalf of Jane Doe 2, alleging that Plaintiff had raped Jane Doe 2 in April 2016. *Id.* On January 28, 2018, Jane Doe 2 herself filed a complaint against Plaintiff. *Id.* ¶ 118.  She alleged that on April 8, 2016, Plaintiff "had non-consensual sex with Jane Doe 2 in her bed in her room when two strangers were there." *Id.*

On February 8, 2018, Plaintiff received a no-contact order ("NCO") from Columbia, informing him that Columbia had received the complaint filed by Jane Doe 2 against Plaintiff. *Id.* ¶ 126.  The NCO specified that Plaintiff was to "avoid contact" with Jane Doe 2, although he could continue to attend his physics class. *Id.* ¶ 127.  On February 16, 2018, Columbia informed Plaintiff that the incident alleged in Jane Doe 2's complaint had actually occurred one day later, on April 9, 2016. *Id.* ¶ 126.  Plaintiff denied having sexual contact with Jane Doe 2 without her consent. *Id.* Plaintiff alleges that the NCO became more restrictive as time went on.  It later provided that Plaintiff would have to enter his physics class from another door than the one used by Jane Doe 2, enter 5 minutes after her, and sit in the back of the class. *Id.* ¶ 127.  Plaintiff alleges that those restrictions "compelled [Plaintiff] to drop his PE class" and "prevented him from staying after class and asking the professor questions." *Id.*

When the restrictions were announced to Plaintiff, Jeri Henry, then the Associate Vice President of Student Conduct and Community Standards, said, "let's try this and if it doesn't work out for you or if you have any problems let us know." *Id.*  In mid-February, Plaintiff's "concerns were met with Ms. Henry saying, 'I have better things to do than [fine-tune NCO stipulations].'" *Id.*

(alteration in original).  The restrictions remained in place until March 2, 2018, when Plaintiff was suspended.  *Id.*

### c. Plaintiff's Harassment and Retaliation Complaint Against Jane Does 1 and 2

On February 5, 2018, Plaintiff received an email from the editor-in-chief of *Bwog*, a student-run campus news website.  *Id.* ¶ 123.  Plaintiff was then a member of Columbia's Student Governing Board ("SGB") leadership.  *Id.*  The *Bwog* editor-in-chief notified the SGB leadership of an "upcoming Bwog article regarding a gender-based misconduct investigation in which the respondent is a member of the SGB leadership, and one of the complainants is a member of No Red Tape."  *Id.*  The *Bwog* editor-in-chief asked if SBG wanted to make a comment and noted that the article would be published at 5 p.m. that day.  *Id.*  Plaintiff contacted Columbia and advised it that the article would interfere with his privacy and the confidentiality of the disciplinary proceedings.  *Id.* ¶ 124.  Ms. Henry informed Plaintiff that Columbia would not prevent the publication.  *Id.*

On February 6, 2018, *Bwog* published the article, disclosing "false and confidential information" about Plaintiff.  *Id.* ¶ 125.  The article states that "one of the complainants is a member of NRT," indicating that there was more than one proceeding against Plaintiff, although Plaintiff at the time was only aware of Jane Doe 1's complaint.  *Id.*  After the article was published, "several people came up to" Plaintiff and told him "they knew it was about him."  *Id.*  Plaintiff alleges that Jane Doe 1 had provided confidential and defamatory information about her allegation to Jane Doe 2 allegation and a *Bwog* editor.  *Id.*

On February 26, 2018, Plaintiff formally filed a complaint against Jane Doe 1 and Jane Doe 2 for harassment and retaliation arising out of the *Bwog* article.  *Id.*

### d. Jane Doe 3

Plaintiff alleges that Jane Doe 3 "had been enamored with" Plaintiff and "sought to have a committed monogamous relationship" with Plaintiff despite Plaintiff's statement that he "was not

interested in the same type of relationship with her." *Id.* ¶ 120.  At some point in 2017, Jane Doe 3 created an Instagram page "dedicated to slandering" Plaintiff, which she used to "encourage other women to make false statements defaming" Plaintiff.  *Id.*

In January 2018, Jane Doe 3 "learned about Jane Doe 1's complaint against John Doe and met with Jane Doe 2."  *Id.* ¶ 121.  From late January to mid-February 2018, Jane Doe 3 accompanied Jane Doe 2 to Plaintiff's physics class and would stare at Plaintiff while "whispering about and jeering at" Plaintiff.  *Id.*

On February 5, 2018, the resident advisor and residence hall director of Jane Doe 3's residence filed an incident report stating that they had been informed by other students that Jane Doe 3 had been sexually assaulted.  *Id.* ¶ 122.  Kimia Sharifi emailed Jane Doe 3 requesting an intake meeting for a sexual misconduct complaint.  *Id.*  On February 15, 2018, Jane Doe 3 attended the intake meeting and complained that Plaintiff had sexually assaulted her on October 15, 2017, and then attempted to rape her on November 7, 2017.  *Id.* ¶ 130.

On March 2, 2018, Columbia began to investigate Jane Doe 3's allegations that Plaintiff had engaged in sexual misconduct against her on four occasions between September 14 and November 7, 2017.  *Id.* ¶ 134.  Columbia issued an NCO regarding Jane Doe 3 to Plaintiff the same day.  *Id.*  On March 24, 2018, Plaintiff was interviewed by Columbia about Jane Doe 3's complaint.  *Id.* ¶ 142.

On April 29, 2018, Plaintiff was notified in writing by Columbia that Jane Doe 3's complaint had been modified to include five allegations of sexual assault and dating violence on six dates rather than four allegations on three dates.  *Id.* ¶¶ 147; 180.  On May 1, 2018, Columbia interviewed Plaintiff for a second time.  *Id.* ¶ 149.  Plaintiff alleges that during the interview, the investigator "ignored facts indicating that Jane Doe 3 had initiated all sexual contact with [Plaintiff] in November 2017 without obtaining affirmative consent from [Plaintiff] and rather questioned [Plaintiff] about whether or not [Plaintiff], subjectively, believed that such sexual activity was consensual."  *Id.*

On April 19, 2018, Plaintiff amended his retaliation and harassment complaint to designate

Jane Doe 3 as a "collaborator."  *Id.* ¶ 147.

On May 1, 2018, Plaintiff's counsel wrote a letter to Ms. Fisher, expressing his concerns

about the disciplinary process:

> It is becoming clear that [Jane Doe 3] has been orchestrating a campaign to level as
> many charges against [John Doe] as possible to derail any hope he has of graduating
> on time.  As [John Doe] has alleged, shortly after filing his cross-complaint against
> [Jane Doe 1], [Jane Doe 3] began accompanying [Jane Doe 2] to [John Doe]'s SCNC
> W1800 physics class, throughout late January and mid-February, a class in which [Jane
> Doe 3] was not enrolled.  [Jane Doe 3] . . . created a fake Instagram page ("Finsta")
> dedicated to slandering [John Doe].  On February 8, 2018, [Jane Doe 2] brought a
> claim against [John Doe].  Based on Jeri Henry's correspondence dated March 23,
> 2018, we are now aware that on February 9, 2018, Jane Doe 3 contacted your office
> regarding her claim against [John Doe].  The timing of these complaint filings is not
> coincidental.
>
> Likewise, the connection between [Jane Doe 3] and [Jane Doe 1] is not coincidental.
> As you know, on December 27, 2017, [Jane Doe 1] brought a gender-based
> misconduct charge against [John Doe].  On January 29, 2018, [John Doe] filed a cross-
> complaint of gender-based misconduct against [Jane Doe 1], alleging that she engaged
> in sexual contact with [John Doe] while he was incapacitated due to alcohol
> consumption.  While [Jane Doe 1]'s charge was pending, she did not claim that [John
> Doe] was sending text messages on the night in question.  [Jane Doe 1] did not make
> such a claim until after [John Doe] filed his cross-complaint against [Jane Doe 1].
> Suddenly, text messages exchanged between [John Doe] and [Jane Doe 3] on the night
> in question were submitted as evidence by [Jane Doe 1] in opposition to [John Doe]'s
> counter-claim  It should be noted that both [Jane Doe 3] and [Jane Doe 1] happen to
> know the same two fraternity brothers who were members of [John Doe]'s fraternity.
> Despite this suspicious connection between the two complainants, Columbia's
> investigators declined to interview [Jane Doe 3] about these messages (including
> questioning, for example, why [Jane Doe 3] provided these text messages to [Jane Doe
> 1] in the first place), and did not question [Jane Doe 1] regarding how she knew,
> specifically, [John Doe] sent text messages to [Jane Doe 3] on the night in question.

*Id.* ¶ 150 (all but the tenth alteration in original).

On May 2, 2018, Plaintiff wrote to the administrator handling his retaliation and harassment

complaints to amend his formal complaint to name Jane Doe 3 as a respondent and to add

additional facts.  *Id.* ¶ 151.  The investigator forwarded Plaintiff's amended complaint to Ms. Fisher.

*Id.*

### e. Jane Doe 4

Plaintiff and Jane Doe 4 "had casually dated in late 2016 when they were juniors." *Id.* ¶ 133. Plaintiff alleges that they never had sexual intercourse. *Id.* Jane Doe 4 was a friend and sorority sister of Jane Doe 3. *Id.* ¶ 139. On March 1, 2018, Serena Barnett, Director of Training and Education in Columbia's Office of Equal Opportunity and Affirmative Action, filed a report of sexual assault on behalf of Jane Doe 4 against Plaintiff. *Id.* ¶ 133. On March 23, 2018, Plaintiff received an NCO resulting from the allegations made by Jane Doe 4. *Id.* ¶ 139. Jane Doe 4 alleged that in the early morning hours of December 13, 2016, she told Plaintiff that she did not want to have sex without a condom. *Id.* ¶ 177. Jane Doe 4 said that, nonetheless, Plaintiff had sex with her without a condom, and without her consent. *Id.* Plaintiff "denied that Jane Doe 4 and he had sexual intercourse on December 13, 2016 and stated that if they had, it was consensual." *Id.* ¶ 175.

### 4. Plaintiff's Interim Suspension

On March 2, 2018, Ms. Henry, Columbia's Associate Vice President of Student Conduct and Community Standards, asked to meet with Plaintiff. *Id.* ¶ 135. When they met, she gave Plaintiff a letter that stated:

> Due to the seriousness of these multiple alleged violations, you are hereby interim suspension [sic] from Columbia University effective immediately until further notice. During this interim suspension, you are ineligible to participate in any Columbia University classes and academic or extracurricular activities . . . [Y]ou are now restricted from accessing all residential housing until further notice . . . [You] may request a prompt and reasonable review of the terms of any of the above directives and submit evidence in support of this request.

*Id.* Plaintiff alleges that "the interim suspension was suddenly imposed on [Plaintiff] without any prior notice and without any kind of prior hearing." *Id.*

On March 5, 2018, Plaintiff sent a letter to Ms. Fisher appealing the interim suspension, along with evidence to support his position. *Id.* ¶ 136. Plaintiff stated that for his first three and a half years at Columbia, he had never been accused of sexual misconduct; that given Defendant's

reliance upon allegations of Jane Does 1–3, Defendant should consider Plaintiff's evidence; that Defendant was forgetting that Plaintiff was a cross-complainant; and that he had paid for and successfully completed 3.7 years at Columbia.  *Id.*  He also denied engaging in sexual misconduct with Jane Does 1–3.  *Id.*  The evidence that Plaintiff submitted consisted of text messages between him and Jane Doe 3 which showed "that [Jane Doe 3] had legitimate romantic feelings toward [Plaintiff], was conflicted by the fact that [their] joint Christian faith did not condone extra-marital relationships, and . . . acknowledg[ed] that [they] both had difficulty avoiding such relationships with each other."  *Id.*

On March 14, 2018, Ms. Fisher denied Plaintiff's appeal and sustained the interim suspension.  *Id.* ¶ 137.  Ms. Fisher asserted that she had considered the evidence Plaintiff had submitted, but nonetheless found that the interim suspension was "appropriate."  *Id.*  She acknowledged that the interim suspension was interfering with Plaintiff's ability to complete his studies and said that Columbia "would provide an alternate means of continuing his studies while suspended."  *Id.*

On March 28, 2018, Plaintiff emailed Ms. Fisher, requesting reconsideration of his interim suspension because Columbia had been "unsuccessful in effectively balancing and implementing accommodations to ensure his academic progress."  *Id.* ¶ 143.  On March 30, 2018, Ms. Fisher replied:

> I think it is important to correct your mischaracterization of the fact that you are being permitted to continue making educational progress remotely and receive notes and take exams off campus as "accommodations."  We have made a modification of your interim suspension from a full interim suspension from all academic and extracurricular activities (and restricting you from the campus as a whole), to a modified interim suspension with special alternative arrangements permitting you to receive notes, recordings and materials from your professors and take exams off campus in order to continue to make academic progress.  This is still a form of interim suspension, based on the fact that you are involved in multiple pending Title IX investigations; this does not and should not enable you to get extra time, or to be given a take home exam when it would not ordinarily be given, or for you to take an exam at an alternative time from your fellow students.

> . . . .
>
> [Y]ou have made a renewed request that I "please revise your finding on the interim suspension and reverse your decision to allow me to continue my studies in accordance with Columbia's policies and Title IX."  At this time, we will not reverse the decision to restrict your attendance in class, or your presence on campus, especially in light of the fact that since you were first placed on interim suspension there has been an additional case filed against [you]—for a total of four pending Title IX investigations.

*Id.* ¶ 144.

Plaintiff completed his coursework and earned three As and one B+ on his final exams that semester.  *Id.* ¶ 155.

### 5.  Adjudication of GBM Allegations

Repeatedly during the investigations of the Jane Doe cases, Plaintiff communicated his concern that Columbia's investigators were not impartial.  *Id.* ¶¶ 128–129, 131, 140–141, 145–146, 148, 154.  On May 1, 2018, Plaintiff's counsel sent a letter to Ms. Fisher objecting to Columbia's lack of process as to the Jane Does 1–4 complaints; Columbia's failure to investigate Plaintiff's sexual misconduct claim against Jane Doe 1; Jane Doe 3 being allowed to file an amended complaint materially changing her allegations to side-step Plaintiff's evidence; the disparate treatment of men and women; and the delay in providing Plaintiff with the specific allegations made by Jane Doe 4.  *Id.* ¶ 150.  On May 9, 2018, Mr. Fisher rejected Plaintiff's concerns.  *Id.* ¶ 152.

### a. Plaintiff's Retaliation and Harassment Complaint Against Jane Does 1–3

On May 17, 2018, Kelly Joyce, Columbia's Senior Director of Student Conduct and Community Standards, informed Plaintiff that the allegations in his complaint about retaliation and harassment—leaking confidential information to *Bwog*, coming to Plaintiff's class and laughing, and coordinating on the Title IX cases—"do not constitute violations of policy" and that Plaintiff "did not experience significant impact to [his] work, education, or living conditions and, as such, the behavior does not qualify as Harassment."  *Id.* ¶ 153.  Plaintiff had been "moved from his room,

suspended from clubs and campus, relegated to remote learning, barred from live participation in classes, deprived of recordings of classes and precluded from on-campus interviews, networking and the like." *Id.* Plaintiff alleges that Columbia dismissed his complaint without asking Jane Does 1–4 a single question. *Id.* Columbia never provided Plaintiff with a report of the interviews it conducted or the material it reviewed to reach its decision to dismiss Plaintiff's complaint. *Id.*

### b. Jane Doe 1

On June 6, 2018, Columbia issued the investigation report in Jane Doe 1's case. *Id.* ¶ 156. The report made credibility determinations in favor of Jane Doe 1 and against Plaintiff, concluding that the oral sex described by Jane Doe 1 was not non-consensual and that Plaintiff's sexual intercourse with Jane Doe 1, while starting as consensual, at some point during the sexual intercourse became non-consensual. *Id.* Plaintiff alleges that in preparing the investigation report Columbia "relied upon hearsay as testimony and evidence, misconstrued testimony via editorializing, and [credited] plain false information." *Id.* ¶ 157. Columbia "also failed to consider objective evidence," such as "the photographic evidence of Jane Doe's kitchenette that she submitted." *Id.* Columbia also failed to consider that Jane Doe 1 may have had an ulterior motive in accusing Plaintiff, even though she had recently dated a member of Plaintiff's fraternity, had been dissatisfied with that relationship, and had been taken to formal by another member of Plaintiff's fraternity. *Id.*

As to Plaintiff's counter-complaint, the report concluded that Plaintiff was not incapacitated. *Id.* ¶ 156. Plaintiff alleges that that finding was "contrary to a medical expert opinion submitted by [Plaintiff]." *Id.* Plaintiff's "difficulties in recollection, instead of being considered in light of the expert medical evidence as reflective of incapacitation, were used to discredit John Doe while concocted tales were credited." *Id.* ¶ 158.

On June 26, 2018, Columbia held a hearing on Jane Doe 1's complaint. *Id.* ¶ 159. Plaintiff alleges that the hearing panel "was openly hostile to [Plaintiff] and essentially rubber stamped the

investigation report." *Id.* Plaintiff alleges that the panel "failed to consider the photographic evidence that corroborated John Doe's assertion of sexual exploitation." *Id.* The panel ruled that the oral sex as described by Jane Doe 1 was not non-consensual and that Plaintiff's sexual intercourse with Jane Doe 1, while starting as consensual, at some point became non-consensual. *Id.* Based upon the hearing panel decision, Cristen S. Scully Kromm, Columbia's Dean of Undergraduate Student Life, sanctioned Plaintiff with a two-year suspension. *Id.* On July 5, 2018, Ms. Kromm wrote to Plaintiff that the conferral of his degree would be delayed by two years and that "disciplinary suspension" would be added to his transcript. *Id.* ¶ 163.

On July 16, 2018, Plaintiff appealed the hearing panel decision and sanction in the Jane Doe 1 proceeding, arguing that the panel had made procedural errors and imposed an excessive sanction. *Id.* ¶ 164. On July 31, 2018, Plaintiff's appeal was denied. *Id.* ¶ 168.

Plaintiff alleges that he "suffered a serious psychological toll from dealing with the June 2018 Jane Doe 1 investigation report and hearing that had come in the wake of Columbia's March 2018 interim suspension, Columbia's May 2018 rejection of his retaliation and harassment complaint and Columbia's May 2018 denial of granting [Plaintiff his] diploma" *Id.* ¶ 160. He "felt under siege, was severely depressed and entertained suicidal thoughts as a result of the four sexual misconduct disciplinary cases in which he insisted he was not guilty." *Id.* Columbia failed to offer him counseling, and the case manager Columbia assigned to him failed to communicate with him at all after February 5, 2018. *Id.* ¶ 161.

### c. Plaintiff's Expulsion for Email Hacking

On July 20, 2018, an investigation conducted as part of a "Dean's disciplinary process" found Plaintiff responsible for email hacking and retaliation. *Id.* ¶ 167. The investigation was conducted by Ms. Joyce, Columbia's Senior Director of Student Conduct and Community

Standards.  *Id.*  On August 2, 2018, Ms. Joyce emailed Plaintiff informing him that, as a result of the investigation's findings, the Dean had permanently expelled him.  *Id.* ¶ 169.

On August 8, 2018, Plaintiff appealed the Dean's decision to expel him.  *Id.* ¶ 170.  On August 29, 2018, his appeal was denied, finalizing the expulsion and preventing him from receiving his degree.  *Id.* ¶ 173.  "Thereafter, the proceedings and decisions made in the two sexual misconduct disciplinary proceedings against [Plaintiff] were in the context of [Plaintiff] having been permanently expelled."  *Id.*

### d. Jane Doe 2

On August 29, 2018, the investigation report was issued in Jane Doe 2's case.  *Id.* ¶ 171.  The report found that Plaintiff was not responsible for the sexual misconduct Jane Doe 2 alleged to have occurred in April 2016.  *Id.*  Jane Doe 2 did not contest the result.  *Id.*

### e. Jane Doe 4

On October 18, 2018, the investigation report was issued in the Jane Doe 4 proceeding.  *Id.* ¶ 174.  The report found that Plaintiff had engaged in non-consensual sexual intercourse with Jane Doe 4 on December 13, 2016.  *Id.*  During the investigation, Plaintiff "denied that Jane Doe 4 and he had sexual intercourse on December 13, 2016 and stated that if they had, it was consensual."  *Id.*  Plaintiff alleges that the report "reached the conclusions it did despite Jane Doe 4's admitted lack of independent memory of the evening of December 13, 2016," that "Columbia, by virtue of this report, left Jane Doe 4's numerous assumptions about facts unexamined, whereas they ensured everything [Plaintiff] said was corroborated or documented," and that Columbia "also included hearsay and gossip under the guise of testimony."  *Id.*  In a statement Plaintiff submitted to the hearing panel, Plaintiff argued that "text messages between me and Jane Doe 4 indicate that I 'ceased the idea' of having sex that morning, which means we never had it."  *Id.* ¶ 175.  The investigative team was "quick to criticize" Plaintiff's statements as inconsistent but was "very

forgiving of [Jane Doe 4]'s admitted lack of 'independent memory' of events just prior to inviting me to her room in the early morning hours of December 13, 2016." *Id.*

On October 31, 2018, Columbia held a hearing on Jane Doe 4's complaint. *Id.* ¶ 176.  On November 5, 2018, Ms. Henry informed Plaintiff that the panel had found that he had engaged in non-consensual intercourse with Jane Doe 4. *Id.* ¶ 177.  On November 9, 2018, Ms. Kromm wrote to Plaintiff that this violation warranted expulsion, but "because you have already been expelled . . . and your transcript reflects the notation of disciplinary expulsion, no further action will be taken at this time." *Id.* ¶ 178.  Plaintiff appealed.  On December 18, 2018, the appeal was denied. *Id.* ¶ 179.

### f. Jane Doe 3

On November 28, 2018, the investigation report was issued in the Jane Doe 3 proceeding. *Id.* ¶ 180.  Jane Doe 3 had alleged five incidents of gender-based misconduct: (1) Sexual Assault—Intercourse on September 14, 2017; (2) Sexual Assault—Contact on September 28, 2017; (3) Dating Violence, Sexual Assault—Intercourse, and Sexual Assault—Contact on October 14–15, 2017; (4) Dating Violence on October 15–November 2, 2017; and (5) Sexual Assault—Intercourse and Sexual Assault—Contact on November 2, 2017. *Id.*  The investigation report found Plaintiff responsible for Dating Violence, Sexual Assault—Intercourse, and Sexual Assault—Contact on October 14–15, 2017. *Id.*  The investigation report found Plaintiff not responsible for the other violations alleged by Jane Doe 3. *Id.*

On January 17, 2019, Columbia held a hearing on Jane Doe 3's complaint. *Id.* ¶ 182.  On January 23, 2019, the hearing panel echoed the findings of the investigation report.  The hearing panel found Plaintiff responsible for Dating Violence, Sexual Assault—Intercourse, and Sexual Assault—Contact that occurred on October 14–15, 2017. *Id.* ¶ 183.  The hearing panel found Plaintiff not responsible for the other alleged violations. *Id.*

Plaintiff submitted an appeal that he characterizes as "timely," although he does not specify

the date on which it was submitted. *Id.* ¶ 184. In his appeal, Plaintiff stated:

> [T]he panelists depart from their duty of impartiality to note that, "Considering the
> length of the relationship [months] and the number of sexual acts [5] occurring within
> this period, it is reasonable that [Jane Doe 3] would mistake a date or confuse
> incidents." This assumption is not supported by anything other than personal opinion.
> This assumption also effectively gives [Jane Doe 3] a "free pass" for her substantive
> inconsistencies. Yet, this assumption is not equally provided to [Plaintiff] for minor
> discrepancies in my memory about events leading up to the incident at issue, years
> after the fact.
>
> . . . .
>
> Similarly, the hearing panel confirmed my characterization of [Jane Doe 3]'s
> narrative as inarticulate when it comes to "specific details and her lack of certainty as
> to dates," yet they went on to chastise me: "[Jane Doe 3]'s account of the . . . specifics
> of what happened may not be clear enough to constitute a preponderance of the
> evidence that a violation occurred, but it is undeniable that misconduct occurred
> during your relationship." The hearing panel's partiality clearly indicates that it *wants*
> to find me responsible for everything that they can. When [Plaintiff] spoke at the
> hearing, the demeanor of the panelists throughout the hearing implied that they could
> barely be bothered to listen, and looked as if their minds were already made up. The
> demeanor of the panelists during the meeting, and the tone of their letter reveal a deep
> antagonism toward me that is tantamount to a disqualifying degree of prejudice.
>
> . . . .
>
> [T]he report unfairly holds my memory to a more rigorous standard than it
> does with [Jane Doe 3]'s. It also credits demeanor as a boon to her and her witnesses
> while my good demeanor, and of the witnesses I called, garnered no advantage.

*Id.* (all but the first, sixth, seventh, and tenth–thirteenth alterations in original). On January

28, 2019, Ms. Kromm sent and emailed a letter to Plaintiff:

> I find it frankly unconscionable that another case representing a similar pattern of
> behavior was brought to the attention of the University. I have serious concern
> regarding your complete lack of judgment and the continued nature of the disturbing
> pattern of behavior in which you engage. After reviewing your impact statement, I
> implore you to engage in more thoughtful self-reflection and/or seek counseling for
> your inexcusable behavior.
>
> The analysis of this matter remains the same as stated in my previous letters to
> you. I have reviewed the file in its entirety and given careful consideration to the
> serious nature of this violation, as well as your prior disciplinary history, and have
> determined that the appropriate sanction in this matter is expulsion. However,

because you have already been expelled from Columbia College and your transcript reflects the notation of disciplinary expulsion, no further action will be taken at this time.

As you know, expulsion is a permanent and complete separation from Columbia University and renders you ineligible to return at any time in the future. The decision to impose a disciplinary expulsion is an appropriate reflection of the seriousness of your behavior in contrast to our community's expectations and values. Unless there is a change to this determination through the appeal process, your disciplinary file will reflect that this matter resulted in expulsion. As a reminder, you remain persona non grata from all Columbia University property, and may only access campus property with prior and proper authorization.

*Id.* ¶ 185. Plaintiff characterizes the letter as "imperious" and argues that it "reflected gender bias in treating [Plaintiff] as an incorrigible serial rapist." *Id.* ¶ 186.

### 6. State Court Proceedings

Plaintiff brought Article 78 challenges in state court contesting two of the gender-based misconduct proceedings and the email hacking determination by Columbia. The Court takes judicial notice of the filings in those cases. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir.1998)).

In the first Article 78 case, *Doe v. Columbia Univ.*, No. 101688/2018, 2020 WL 999006 (N.Y. Sup. Ct. Jan. 6, 2020), Plaintiff challenged the Jane Doe 1 and email hacking proceedings. Plaintiff's petition was dismissed on the merits. *Doe v. Columbia Univ.*, 2020 WL 999006 NYSCEF 21, at *9. The court in that case found that Columbia had (1) substantially complied with its GBM Policy in adjudicating the Jane Doe 1 proceeding; (2) not improperly shifted the burden to Plaintiff in the Jane Doe 1 proceeding; (3) not applied a different credibility standard to Plaintiff and Jane Doe 1 in light of Plaintiff's incapacitation; and (4) shown by a preponderance of the evidence that Plaintiff violated the GBM policy. *Id.* at *5–7. The court also found that Columbia's decision to expel Plaintiff was

not "arbitrary and capricious" because it did not "shock the conscience" in light of Columbia's findings that Plaintiff had "violated Columbia's GBM Policy . . . and its Standards and Discipline rules by hacking into another student's email account and sending a fraudulent email to Columbia's Title IX Coordinator in an attempt to have another sexual assault complaint against him withdrawn." *Id.* at *8.

In the second Article 78 case, *Doe v. Columbia Univ.*, No. 153940/2019 (N.Y. Sup. Ct. Sept. 11, 2020), Plaintiff challenged the Jane Doe 4 proceeding. Plaintiff dismissed that case with prejudice. *Id.*

### B.  Procedural History

Plaintiff filed his complaint in this case on September 14, 2020. Compl., Dkt. No. 14. Plaintiff brings seven Title IX causes of action against Columbia:  (1) erroneous outcome in imposing the interim suspension; (2) selective enforcement in imposing the interim suspension; (3) harassment in imposing the interim suspension; (4) erroneous outcome in the Jane Doe 1 proceeding; (5) selective enforcement in the Jane Doe 1 proceeding; (6) erroneous outcome in the Jane Doe 4 proceeding; and (7) erroneous outcome in the Jane Doe 3 proceeding. For each Count in the Complaint, Plaintiff seeks injunctive relief vacating his GBM disciplinary findings, granting him a diploma, removing the disciplinary expulsion notation on his transcript, and enjoining future violations of Title IX in re-adjudicating these incidents, as well as damages resulting from Plaintiff's injuries to his reputation, educational and athletic opportunities, career prospects, physical, emotional, and psychological well-being, and other economic losses, as well as attorneys' fees and costs. Compl. ¶¶ 115–19.

Defendant filed a motion and supporting memorandum of law to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P

12(b)(6) for failure to state a claim.  Dkt. No. 28.  Plaintiff filed his opposition to the motion to

dismiss, Dkt. No. 32 ("Pl.'s Opp'n"), and Defendant filed its reply.  Dkt. No. 33 (Def.'s Reply").

## II.  DISCUSSION

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant has moved to dismiss for lack of subject matter jurisdiction Plaintiff's claims for

injunctive relief relating to his expulsion from Columbia and failure to obtain a Columbia diploma.

#### 1.  Legal Standard

##### a.  Rule 12(b)(1)

"A district court properly dismisses an action under Fed R. Civ. P. 12(b)(1) for lack of

subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,'

such as when . . . the plaintiff lacks constitutional standing to bring the action." *Courtland St. Recovery*

*Corp. v. Hellas Telcomms., S.a.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United*

*States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Where, as here, "the Rule 12(b)(1) motion is facial, *i.e.*,

based solely on the allegations of the complaint . . . [t]he task of the district court is to determine

whether the [complaint] allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has

standing to sue." *Carter v. Healthport Techs, LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (third and fourth

alterations in original) (internal quotations and citations omitted).  "At the pleading stage, general

factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to

dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary

to support the claim." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  The Court

must "accept[] as true all material factual allegations of the complaint, and draw[] all reasonable

inferences in favor of the plaintiff." *Id.* at 57.

### b. Article III Standing

"Article III restricts federal courts to the resolution of cases and controversies . . . .  That restriction requires that the party invoking federal jurisdiction have standing—the personal interest that must exist at the commencement of the litigation." *Carter*, 822 F.3d at 55 (omission in original). "This is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "The "'irreducible constitutional minimum" of standing consists of three elements': the individual initiating the suit 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (quoting *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016)).  The party seeking to invoke federal jurisdiction bears the burden of establishing each of these elements.  *See Spokeo*, 136 S. Ct. at 1547.  A party invoking federal court jurisdiction must have "standing" to sue "for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n. 15 (2d Cir. 2003).

Defendant's motion here focuses on the second of these three elements—traceability, or causation.  "The traceability requirement for Article III standing means that the plaintiff must 'demonstrate a causal nexus between the defendant's conduct and the injury.'" *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992)).

> Such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue.  However, while the "indirectness" of an injury "'may make it substantially more difficult'" to show the "fairly traceable" element of Article III standing, *i.e.,* "'to establish that, in fact, the asserted injury was the consequence of the defendants' actions," indirectness is "not necessarily fatal to standing," because the "fairly traceable" standard is lower than that of proximate cause.  "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence."

*Id.* (citations omitted).

"The requirement that a complaint allege[] an injury that is fairly traceable to defendants' conduct . . . for [purposes of] constitutional standing is a lesser burden than the requirement that it show proximate cause." *Id.* at 92. (alterations in original) (internal quotation marks and citation omitted). The fact that there is an intervening cause of a plaintiff's injury is not necessarily a basis to find that the injury is not "fairly traceable" to a defendant's conduct, even if that intervening cause would foreclose a finding of proximate cause. *Id.* As a result, the Second Circuit has noted that "particularly at the pleading stage, the 'fairly traceable' standard is not equivalent to a requirement of tort causation' and that 'for purposes of satisfying Article III's causation requirement, we are concerned with something *less than the concept of proximate cause.*" *Id.* (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 346 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011)).

At the pleading stage of an action, as here, "the plaintiff's burden . . . of alleging that their injury is 'fairly traceable' to the challenged act is relatively modest." *Id.* (internal quotations and citation omitted). "In sum, the test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause." *Id.* Rather than a showing of proximate cause, "Article III 'requires no more than *de facto* causality.'" *U.S. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) (distinguishing between the "*legal cause*" of an injury and traceability, "which requires no more than *de facto* causality")).

### c. Mootness

"Under Article III of the U.S. Constitution, [w]hen a case becomes moot, the federal courts lack subject matter jurisdiction over the action." *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (per curiam) (internal quotation marks and citation omitted). "Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies." *In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010). "A case becomes moot when interim

relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Van Wie v. Pataki*, 267 F.3d 109, 113 (2d Cir. 2001).

"Federal courts may not 'decide questions that cannot affect the rights of the litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alteration in original).  A claim is mooted where "it becomes impossible for the court, through the exercise of their remedial powers, to do anything to redress the injury." *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994) (quoting *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993)).

### 2. Application

#### a. Article III Standing

Plaintiff challenges the GBM proceedings in this action.  But Plaintiff's expulsion from Columbia and failure to obtain his diploma resulted from a disciplinary proceeding not challenged here.  Because the GBM proceedings at issue in this case were not even a *de facto* cause of that expulsion, Plaintiff lacks Article III standing to bring claims for injunctive relief and damages arising from his expulsion and lack of a diploma.

In this case, Plaintiff alleges that Columbia's decision to issue an interim suspension to Plaintiff and its determination that Plaintiff was responsible for GBM violations in the Jane Doe 1, 3, and 4 proceedings were infected with gender bias.  He seeks "an injunction vacating [his] disciplinary findings and decisions, granting the diploma [he] earned, [and] expungement of [his] transcript and disciplinary record."  *See, e.g.*, Compl. ¶ 205.  He also seeks damages relating to those injuries.  *Id.* ¶¶ 206–07.

The issue is whether Plaintiff's expulsion is fairly traceable to the GBM proceedings.  In the Complaint, Plaintiff states he "was permanently expelled as a result of the decision finding him

responsible for the e-mail hacking and alleged retaliation in connection with the e-mail hacking." *Id.* ¶ 169.  However, nowhere in the Complaint does Plaintiff challenge Columbia's determination that he was responsible for email hacking and retaliation.  Nor does Plaintiff challenge the sanction imposed by the disciplinary proceeding that led to his expulsion for email hacking.  The Complaint also states that after Columbia found Plaintiff responsible for GBM violations against Jane Does 3 and 4, Plaintiff was informed that those violations warranted expulsion, but "because [Plaintiff had] already been expelled . . . no further action [would] be taken at [that] time." *Id.* ¶¶ 178, 185.

As pleaded by Plaintiff, the GBM proceedings Plaintiff challenges here were not a cause of Plaintiff's expulsion, transcript notation regarding the expulsion, or failure to obtain his diploma from Columbia.  Therefore, any injuries from Plaintiff's expulsion, transcript notation regarding the expulsion, and failure to obtain his diploma cannot be redressed by a favorable decision in this case, and Plaintiff lacks Article III standing to seek relief for those injuries here.  The Court notes that Defendant has conceded that Plaintiff has standing to seek monetary damages that do not arise from his expulsion and lack of diploma.

In his opposition brief, Plaintiff argues that he has standing to pursue his injunctive relief claims because "[a]ccording to the Complaint, the e-mail hacking and expulsion/denial of diploma were very much part and parcel of the existing Title IX proceedings and were an effect of the deliberate indifference Title IX discrimination."  Pl.'s Opp'n at 21.  Plaintiff correctly asserts that it is improper on a motion to dismiss to "ignore how the e-mail hacking and expulsion/denial of diploma are treated in the Complaint." *Id.*  He maintains the Complaint alleges that "the e-mail hacking was in the context of and resulted from Defendant's discriminatory conduct concerning the interim suspension, the handling of four disciplinary cases against Plaintiff all brought in his second semester of his senior year, the arbitrary summary rejection of Plaintiff's counter-complaint and the deliberate indifference to Plaintiff as a male . . . respondent/complainant who was driven to

consider suicide." Pl.'s Opp'n at 22.  Plaintiff cites to *Rothstein v. UBS AG*, 708 F.3d 82, 91–92 (2d Cir. 2013) for the correct proposition that an indirect relationship is enough to meet the traceability requirements, and that standing can exist even though proximate causation might not.  Pl.'s Opp'n at 21.

But contrary to Plaintiff's assertions, that theory does not find support in the Complaint—it is only presented in his opposition brief.  "It is well established in this district that a plaintiff cannot amend his pleadings in his opposition briefs." *Fac., Alumni, & Students Opposed to Racial References v. New York Univ. L. Rev.*, No. 18 Civ. 9184, 2020 WL 1529311, at *7 (S.D.N.Y. Mar. 31, 2020).  The Complaint alleges that, as a result of the GBM complaints, Plaintiff "suffered a serious psychological toll . . . .  [He] felt under siege, was severely depressed and entertained suicidal thoughts as a result of the four sexual misconduct disciplinary cases in which he insisted he was not guilty."  Compl. ¶ 160. He further alleges that "Columbia evinced no concern and failed to offer counseling to a male respondent facing four disciplinary cases suddenly arising [in] his senior year in his last semester at Columbia in 2018, with two of the cases relating to alleged events in 2016," and that "Columbia's case manager . . . assigned to [Plaintiff] had not only failed to accommodate [Plaintiff]'s needs as a student, she had failed to even communicate with [Plaintiff] after February 5, 2018, which was neglect indicating deliberate indifference to [Plaintiff]'s education."  *Id.* ¶ 161.  Plaintiff only briefly mentions his expulsion for email hacking in the Complaint.  He states:

> On July 20, 2018, in the Dean's disciplinary process regarding the e-mail hacking and alleged retaliation, [Plaintiff] was found responsible in an investigation conducted by Kelly Joyce, Senior Director of Student Conduct and Community Standards.
>
> . . . .
>
> On August 2, 2018, Kelly Joyce . . . sent an e-mailed letter to [Plaintiff] informing him that he was permanently expelled as a result of the decision finding him responsible for e-mail hacking and alleged retaliation . . . .
>
> On August 9, 2018, [Plaintiff] appealed the Dean's decision to expel him for the email hacking and alleged retaliation.

. . . .

On August 29, 2018, [Plaintiff]'s appeal of the Dean's sanctioning decision of permanent expulsion was denied, making the expulsion a final order and prohibiting [Plaintiff] from receiving the degree that he had paid for and worked four years to earn. Thereafter, the proceedings and decisions made in the two sexual misconduct disciplinary proceedings against [Plaintiff] were in the context of [Plaintiff] having been permanently expelled.

*Id.* ¶¶ 167, 169–170, 173. That is the totality of the Complaint's treatment of Plaintiff's email hacking and expulsion. Plaintiff does not—at least, not in the Complaint—even attempt to link the GBM procedures and Columbia's alleged discrimination against him to his email hacking. He does not allege any facts that might give rise to a plausible inference that Columbia's poor treatment of him in the GBM proceedings caused him to commit email hacking. The standard for pleading causation sufficient to confer standing is, as Plaintiff correctly asserts, low. But Plaintiff has failed to meet even this low standard because he has not pleaded any facts that would give rise to a plausible inference linking his email hacking to Columbia's poor treatment of him in the GBM proceedings.

Accordingly, the Court lacks subject matter jurisdiction to grant Plaintiff's claims for injunctive relief and damages arising from his expulsion and lack of a diploma.

### b. Mootness

The Court also lacks subject matter jurisdiction over Plaintiff's claims for injunctive relief and damages arising from his expulsion and lack of a diploma because those claims became moot when he was expelled from Columbia for email hacking. "Federal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinion[s] advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alteration in original); *see also Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135 (2d Cir. 1994) (holding that a claim is mooted where "it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury").

Here, as the Court has explained in section II(A)(2)(a), Plaintiff was expelled from Columbia and failed to obtain his Columbia diploma because Columbia found that he had engaged in email hacking. Plaintiff has not challenged that disciplinary proceeding in this matter. Accordingly, any decision by the Court regarding Plaintiff's claims for relief related to his expulsion from Columbia and lack of diploma would not change the fact that Plaintiff was independently expelled and lacks a diploma due to the email hacking disciplinary procedure.

Plaintiff again argues that his case is not moot because the Complaint alleges that his email hacking was "in the context of and resulting from Defendant's discriminatory conduct." Pl.'s Opp'n at 23. As the Court discussed above, however, the Complaint does not allege that, or indeed any facts giving rise to a plausible inference that Plaintiff's email hacking resulted from Columbia's conduct during the GBM proceedings. Plaintiff also argues that the Complaint "shows the expulsion did not moot Defendant's prosecution of the disciplinary cases against Plaintiff" because Columbia continued the GBM proceedings against Plaintiff even though he was already expelled. *Id.* (citing Compl. ¶¶ 173–186). But this does not change the fact that, regardless of the outcome of this case, Plaintiff will remain expelled from Columbia and will continue to lack a Columbia diploma because Columbia found that he had engaged in email hacking.

Accordingly, for the same reasons that he has failed to plead Article III standing with respect to his claims for injunctive relief and damages arising from his expulsion and lack of a diploma, those claims are also moot.

## B. Res Judicata

### 1. Legal Standard

The doctrine of res judicata provides that

a valid, final judgment, rendered on the merits, constitutes an absolute bar to a subsequent action between the same parties, or those in privity with them, upon the same claim or demand. It operates to bind the parties both as to issues actually litigated and determined in the first suit, and as to those grounds or issues which might have

been, but were not, actually raised and decided in that action.  The first judgment, when final and on the merits, thus puts an end to the whole cause of action.

*Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 108–09 (2d Cir. 2001) (quoting *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir. 1968)).  "Thus, the doctrine bars 'later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action.'"  *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (alteration in original) (quoting *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985)).  Res judicata "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication."  *Id.* (alterations in original) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

        "In considering the preclusive effect of a state court judgment on a subsequent federal action, . . . [courts] usually consult the preclusion laws of the state in which the judgment was issued."  *Hanrahan v. Riverhead Nursing Home*, 592 F.3d 367, 369 (2d Cir. 2010) (first alteration in original) (quoting *Nestor v. Pratt & Whitney*, 466 F.3d 65, 71 (2d Cir. 2006)); *see also Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) ("There is no doubt that 'a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984))); *Ferris v. Cuevas*, 118 F.3d 122, 125–26 (2d Cir. 1997) ("[W]e give preclusive effect to a state court judgment whenever the courts of that state would do so . . . .").  Accordingly, in determining the preclusive effect of the Article 78 proceedings, the Court will apply New York's preclusion laws.

        New York "has adopted the transactional analysis approach in deciding *res judicata* issues. Under this [analysis], once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if

seeking a different remedy." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981); *see also Simmons v. Trans Express Inc.*, No. 34, 2021 WL 2228828 (N.Y. June 3, 2021) (noting that the New York Court of Appeals has "consistently applied a 'transactional analysis approach' in determining whether an earlier judgment has claim preclusive effect").  "A cause of action arises from the 'same transaction' and is barred by the judgment in a prior proceeding 'where the same foundation facts serve as a predicate for each proceeding.'" *Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 28 (2d Cir. 1986) (quoting *Reilly v. Reid*, 45 N.Y.2d 24, 30 (1978)), overruled on other grounds by *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002).  The New York Court of Appeals has followed the Restatement (Second) of Judgments in "analyzing 'whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Xiao Yang Chen v. Fischer*, 6 N.Y.3d 94, 100–01 (2005) (quoting Restatement (Second) of Judgments § 24(2)). "[W]hatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of res judicata." *Berlitz Schs. of Languages of Am., Inc. v. Everest House*, 619 F.2d 211, 215 (2d Cir. 1980).

## 2. Application

Because Plaintiff has already challenged the Jane Doe 1 and Jane Doe 4 GBM proceedings in Article 78 actions in state court, his claims for injunctive relief arising from the Jane Doe 1 and Jane Doe 4 GBM proceedings are precluded by res judicata.

Plaintiff has already tried to obtain injunctive relief in New York state court through his Article 78 proceedings with respect to the Jane Doe 1 and Jane Doe 4 GBM proceedings.  In the first Article 78 proceeding, Plaintiff challenged the email hacking and Jane Doe 1 proceedings and attempted to obtain his diploma.  He asked the state court to "annul" the GBM decision, "issu[e] him a diploma, [and] expunge[e] his disciplinary record." *Doe v. Columbia Univ.*, No. 101688/2018,

2020 WL 999006, at *3 (N.Y. Sup. Ct. Jan. 6, 2020). The state court issued a decision on the merits

rejecting Plaintiff's efforts to obtain his diploma. *Id.* at *9. Similarly, in the second Article 78

proceeding, Plaintiff sought relief "reinstating [Plaintiff] in good standing at Columbia," "awarding

[Plaintiff] his rightfully-earned diploma," and "expunging any and all reference of/to the disciplinary

incident at issue from [Plaintiff's] record." Verified Pet. ¶ 124(c), *Doe v. Columbia Univ.*, No.

153940/2019 (N.Y. Sup. Ct. Sept. 11, 2020), NYSCEF No. 1. Plaintiff voluntarily dismissed that

action with prejudice because dismissal of Plaintiff's first Article 78 proceeding rendered the second

Article 78 proceeding moot. Stipulation and Order, *Doe v. Columbia Univ.*, No. 153940/2019 (N.Y.

Sup. Ct. Sept. 11, 2020), NYSCEF No. 21. In this case, in addition to damages, Plaintiff asks for the

same injunctive relief he sought in the Article 78 proceedings: to "vacat[e]" the GBM decision,

"grant[ him a] diploma," and "expunge[ his] transcript of the disciplinary record." Compl. ¶¶ 201,

207, 216, 222, 227, 233, 239.

Plaintiff is precluded from relitigating the claims arising from the Jane Doe 1 and Jane Doe 4

proceedings that he challenged in the two Article 78 proceedings. Under New York law, "once a

claim is brought to a final conclusion, all other claims arising out of the same transaction or series of

transactions are barred, even if based upon different theories or if seeking a different remedy."

*O'Brien*, 54 N.Y.2d at 357 (1981). "A cause of action arises from the 'same transaction' and is barred

by the judgment in a prior proceeding 'where the same foundation facts serve as a predicate for each

proceeding.'" *Fay*, 802 F.2d at 28. However, res judicata does not bar subsequent litigation where

the prior action could not have provided the relief the plaintiff seeks in the subsequent litigation. *See*

*Leather*, 180 F.3d at 425; *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). The damages that may be

obtained through an Article 78 proceeding are circumscribed by the nature of that action. Only

damages "incidental to the primary relief sought" may be awarded in an Article 78 proceeding.

N.Y.C.P.L.R. § 7806; *Parker v. Blauvelt Volunteer Fire Co.*, 690 N.Y.S.2d 478, 482 (1999). But an

Article 78 proceeding does preclude a later action under the doctrine of res judicata to the extent

that "a plaintiff in a later action brings a claim for damages that could have been presented in a prior

CPLR article 78 proceeding against the same party, based upon the same harm and arising out of the

same or related facts." *Parker*, 690 N.Y.S.2d at 481.

Here, as Defendant concedes, Plaintiff's claims for damages in the Jane Doe 1 and Jane Doe

4 proceedings that are not incidental to the injunctive relief he sought are not precluded by res

judicata because Article 78 proceedings only award damages that are incidental to the primary relief

sought.

Plaintiff's claims for injunctive relief pertaining to Jane Does 1 and 4, however, are

precluded.  In his first Article 78 proceeding, Plaintiff brought claims for the same injunctive relief

he now seeks—his diploma and an expungement of his disciplinary record—arising from the Jane

Doe 1 proceeding.  The state court rejected Plaintiff's claims and dismissed his petition, producing a

final judgment on the merits.  As a result, any claims for injunctive relief and damages incidental to it

arising from the "same transaction"—that is, from the facts arising from the Jane Doe 1 GBM

proceeding—are barred by the judgment in the prior Article 78 proceeding.  That Plaintiff now

seeks injunctive relief under a different legal theory—here, under the theory that Columbia

discriminated against him based on his gender in violation of Title IX—is not relevant to the claim

preclusion analysis.  What matters is that Plaintiff pursued a claim arising from the same facts in a

proceeding that could have provided the same relief.  Accordingly, Plaintiff's claims for injunctive

relief and damages incidental to it relating to the Jane Doe 1 GBM proceeding are barred.

Plaintiff brought similar claims for injunctive relief in his second Article 78 proceeding,

regarding Jane Doe 4.  The state court in that case entered a stipulation of discontinuance with

prejudice.  "In considering the preclusive effect of a state court judgment on a subsequent federal

action, [courts] usually consult the preclusion laws of the state in which the judgment was issued."

*Hanrahan v. Riverhead Nursing Home*, 592 F.3d 367, 369 (2d Cir. 2010) (quoting *Nestor v. Pratt & Whitney*, 466 F.3d 65, 71 (2d Cir. 2006). Under New York law, "[a] stipulation of discontinuance with prejudice without reservation of right or limitation of the claims disposed of is entitled to preclusive effect under the doctrine of res judicata" *Wells Fargo Bank, Nat'l Ass'n v. Enbar*, 104 N.Y.S.3d 183, 185–86 (2d Dep't 2019); *see also Liberty Assoc. v. Etkin*, 893 N.Y.S.2d 564, 565–66 (2d Dep't 2010); *Mooney v. Manhattan Occupational, Physical & Speech Therapies, PLLC*, 89 N.Y.S.3d 707, 710 (2d Dep't 2018); *Trapani v. Squitieri*, 965 N.y.S.2d 887, 887–88 (2d Dep't 2013); *In re Chiantella v. Vishnick*, 922 N.Y.S.2d 525, 527 (2d Dep't 2011). Accordingly, Plaintiff's claims for injunctive relief and damages incidental to it relating to the Jane Doe 4 GBM proceeding are barred.

Plaintiff argues that he "is not barred by res judicata of a prior state law Article 78 proceeding from bringing a subsequent federal law-based suit." Pl.'s Opp'n at 24. He emphasizes that he "now brings only federal law issues" and "new facts" because the Article 78 proceedings were not Title IX claims and did not concern Jane Does 2 and 3. *Id.* He cites *Karamoko v. New York City Housing Authority*, 170 F. Supp. 2d 372 (S.D.N.Y. 2001) and *Davidson v. Capuano*, 792 F.2d 275 (2d Cir. 1986) in support of his argument that a "federal action" based on the same facts is not barred by res judicata. Plaintiff mischaracterizes both of those cases. In *Karamoko*, the plaintiff, after bringing an Article 78 action for injunctive relief, brought a federal lawsuit under, *inter alia*, 42 U.S.C. § 1983, the Americas with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act. 170 F. Supp. 2d at 376. The court held that while res judicata did not bar the plaintiff's claim for damages, it did preclude her claim claims for injunctive and declaratory relief. *Id.* at 377. Similarly, in *Davidson*, the Second Circuit held that a prisoner's claim for civil rights damages was not barred by res judicata, even though the claim was based on the same facts as the prisoner's prior Article 78 proceeding, because damages were not available in the Article 78 proceeding. 792 F.2d at 278–79. Here, too, Columbia concedes that Plaintiff's claims for damages—other than those incidental to the

injunctive relief he sought—are not precluded, even though they arise out of the same facts as his Article 78 proceedings, because such damages are unavailable in Article 78 proceedings. But as in *Karamoko*, Plaintiff's claims for injunctive relief, and damages incidental to that relief, pertaining to the Jane Doe 1 and Jane Doe 4 GBM proceedings, are precluded.

Judge Cote's decision in *Vega v. SUNY Board of Trustees*, 67 F. Supp. 2d 324 (S.D.N.Y. 1999) is instructive here. In *Vega*, as in this case, a plaintiff who allegedly violated SUNY's sexual harassment policy brought an Article 78 proceeding requesting to be reinstated with back pay. 67 F. Supp. 2d at 331. The *Vega* plaintiff then filed a complaint in federal court based on the same facts, alleging violations of Title IX, and again sought reinstatement and back pay, in addition to compensatory and punitive damages. *Id.* Judge Cote noted that although the plaintiff's claims for compensatory and punitive damages were not precluded, "res judicata bars relitigation" of the claims for reinstatement and back pay because the plaintiff "could have received" that relief in the Article 78 proceeding. *Id.* at 334. The court held that the plaintiff's Title IX claim against SUNY could proceed, but that "[a]ny demand against the SUNY Defendants for reinstatement [and] back pay is . . . dismissed." *Id.* at 343.

Likewise, here, Plaintiff's claims for damages that he could not have obtained in the Article 78 proceedings are not precluded, but his claims for injunctive relief are. That he now brings his claims for injunctive relief under Title IX but brought them under a different legal theory in the Article 78 proceedings makes no difference. Because Plaintiff could have received injunctive relief in the Article 78 proceedings, the doctrine of res judicata precludes Plaintiff from bringing claims for injunctive relief based on the Jane Doe 1 and Jane Doe 4 GBM proceedings.

### C. Motion to Dismiss for Failure to State A Claim Under Title IX

#### 1. Legal Standard

##### a. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012)). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ." *Twombly*, 550 U.S. at 556.

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### b. Title IX

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of

gender in educational programs and activities that receive federal funds. The statute provides, with

certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "This

provision, which is enforceable through an implied private right of action, was enacted to

supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in

universities." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016). As a result, "[c]ourts have

interpreted Title IX by looking to . . . caselaw interpreting Title VII." *Id.* at 55 (quoting *Yusuf v.*

*Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994)).

> Title IX bars the imposition of university discipline where gender is a motivating factor
> in the decision to discipline . . . .
>
> Plaintiffs attacking a university disciplinary proceeding on grounds of gender
> bias can be expected to fall generally within two categories. In the first category, the
> claim is that the plaintiff was innocent and wrongly found to have committed an
> offense. In the second category, the plaintiff alleges selective enforcement. Such a
> claim asserts that, regardless of the student's guilt or innocence, the severity of the
> penalty and/or the decision to initiate the proceeding was affected by the student's
> gender.

*Yusuf*, 35 F.3d at 715 (citation omitted).  "In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of . . . discriminatory intent."  *Id.* at 713.

> Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.  If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail. . . .  However, the pleading burden in this regard is not heavy.  For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge.  A complaint may also allege particular procedural flaws affecting the proof.
>
>  . . . .  A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.

*Id.* at 715.

In order to state a selective enforcement claim, a plaintiff must allege "that a school treated similarly situated members of the opposite sex—that is, members of the opposite sex facing comparable disciplinary charges—differently" and "plead[] specific facts that support a minimal plausible inference of . . . discrimination."  *Doe v. New York Univ.*, 438 F. Supp. 3d 172, 182 (S.D.N.Y. 2020) (citations omitted); *see also Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) ("To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." (alteration in original) (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003))).

A complaint under Title IX "alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a minimal plausible inference of such discrimination."  *Columbia*, 831 F.3d at 56.  "[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the

university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) (emphasis in original).

In *Columbia*, the Second Circuit concluded that the plaintiff had adequately alleged that the hearing panel was motivated in its actions by "pro-female, anti-male bias." *Columbia*, 831 F.3d at 56. "Those alleged biased attitudes were, at least in part, adopted to refute criticisms circulating in the student body and in the public press that [the university] was turning a blind eye to female students' charges of sexual assaults by male students." *Id.*

The Second Circuit summarized the allegations that established gender bias in that case as follows:

> Both the investigator and the panel declined to seek out potential witnesses Plaintiff had identified as sources of information favorable to him. . . .  The investigator and the panel failed to act in accordance with University procedures designed to protect accused students.  The investigator, the panel, and the reviewing Dean, furthermore, reached conclusions that were incorrect and contrary to the weight of the evidence.
>
> . . . .
>
> . . . [D]uring the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. . . .  [T]he University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue.

*Id.* at 56–57 (footnote omitted).

### c. Consideration of Exhibits Attached to the Parties' Memoranda of Law

In the context of a motion to dismiss brought under Rule 12(b)(6), "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch*, 952 F.3d at 76.  "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits.  The Rule thus assesses the legal feasibility of the

complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotations and citations omitted). As the Second Circuit recently reaffirmed in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch*, 952 F.3d at 79 (citations omitted).

A court can also consider documents that are "integral to" the complaint. In order for a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects. *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relied heavily upon its terms and effects, thereby rendering the document integral to the complaint.") (internal quotation marks and citation omitted). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "It also must be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*

Here, the parties have attached several documents to their motions that were not included in the Complaint. Defendant has attached Columbia's Gender-Based Misconduct Policy and Procedures for Students, Dkt. No. 31-1, to its motion to dismiss; Plaintiff has attached Columbia's Student Gender-Based Misconduct Prevention and Response 2019-2020 Annual Report, Dkt. No.

32-1 Ex. A, and Columbia's Student Gender-Based Misconduct Prevention and Response 2018-2019 Annual Report, Dkt. No. 32-1 Ex. B.

Columbia's Gender-Based Misconduct Policy and Procedures are integral to the Amended Complaint because they are written instruments and Plaintiff relies heavily on their terms and effects. The GBM governs the conduct of the parties during the Title IX adjudication at issue here and Columbia's alleged violations of the GBM referenced pleaded repeatedly by Plaintiff in support of his Title IX claims. *See, e.g.*, Compl. ¶¶ 128, 129, 136 (quoting the GBM, and stating, "Columbia took baseless allegations and ignored the text of its own policies in completely ending my ability to finish my studies. The interim suspension violates Columbia's policies and Columbia's representations to me as a student"), 145 ("Columbia was not adhering to [its] Policies regarding impartiality and conflicts of interest"); 150 ("I am writing to express my concern regarding Columbia University's . . . lack of adequate process, and inequitable enforcement of its policies regarding the charges [John Doe] is defending and prosecuting against [Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4] . . . Additionally, it appears that Columbia has failed to enforce its policy regarding false statements (p. 25) against [Jane Doe 3]" (all alterations but ellipsis in original)). The GBM is cited and quoted extensively. *See, e.g.*, *id.* ¶¶ 77, 128, 129, 136, 144. The GBM is a "written instrument" that "defines rights, duties, entitlements or liabilities." *See Lynch*, 952 F.3d at 79 (quoting *Black's Law Dictionary*). Plaintiff's reliance on the GBM in framing his claims makes these documents "integral" to the pleading. Plaintiff does not dispute the accuracy or authenticity of this document.

Courts have routinely considered such policy and procedure documents on motions to dismiss in the context of Title IX claims because they are integral to the complaint. *See, e.g.*, *Doe v. New York Univ.*, No. 1:20-cv-1343 (GHW), 2021 WL 1226384, at *15 (March 31, 2021) ("[T]he Policy and the Procedures are integral to the Amended Complaint because they are written instruments and Plaintiff relies heavily on their terms and effects."); *Feibleman v. Trs. of Columbia*

*Univ.*, No. 19-cv-4327 (VEC), 2020 WL 882429, at *11 (S.D.N.Y. Feb. 24, 2020) ("Although the Complaint does not include the [Gender Based Misconduct Policy] as an attachment or expressly incorporate it by reference, the Court may nonetheless consider it because Plaintiff's reliance on the GBMP throughout the Complaint made it 'integral' to the pleading."); *B.B. v. The New School*, No. 17 Civ. 8347 (AT), 2018 WL 2316342, at *1–2, *2 n.3 (S.D.N.Y. Apr. 30, 2018) (considering the school's Sexual Misconduct & Violence Policy because the complaint "quotes from and relies on it").  Accordingly, the Court will consider Columbia's GBM Policy.

The 2018–2019 and 2019–2020 Annual Reports, however, are not integral to the complaint.  Plaintiff does not mention those annual reports anywhere in his complaint.  The reports do not define rights, duties, entitlements, or liabilities.  The Annual Reports bear no clear relation to the Complaint.  Accordingly, the Court will not consider them.

### 2. Application

#### a. Erroneous Outcome in Imposing Interim Suspension

Plaintiff challenges the allegedly erroneous result of his interim suspension.  Because he has alleged facts sufficient to cast some articulable doubt on the disciplinary action, and circumstances giving rise to a minimal plausible inference of discriminatory intent by Columbia, Plaintiff has stated an erroneous outcome claim with regard to his interim suspension.

*i. Facts Sufficient to Cast Some Articulable Doubt*

Plaintiff has raised substantial concerns regarding the procedural fairness of the interim suspension as well as issues regarding the credibility of the evidence Columbia relied on in issuing the interim suspension.  The facts alleged are sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding.

First, Plaintiff alleges that "[t]he interim suspension was suddenly imposed on [him] without any prior notice and without any kind of prior hearing."  Compl. ¶ 135.  Plaintiff was given the

opportunity to "request a prompt and reasonable review of the term" of the interim suspension in writing after it was imposed, which he did. *Id.* But he was never given a hearing of any sort, and has pleaded that the opportunity Columbia offered him to appeal the decision in writing did not constitute a meaningful opportunity to be heard. That the suspension was imposed with no prior notice and without a hearing raises concerns about procedural fairness.

Second, Plaintiff raises concerns about the credibility of the evidence Columbia relied on in issuing the interim suspension. He alleges that Columbia relied solely on the allegations by Jane Does 1–3, some of which "ultimately would not be sustained," and failed to consider that Plaintiff was a complainant in cases against Jane Does 1 and 2. *Id.* ¶ 136. Plaintiff also alleges that Jane Does 1–3 were working together and that Columbia did not investigate their motivations. Plaintiff states that Jane Doe 1 provided confidential and defamatory information about Jane Doe 2's allegation to a *Bwog* editor. *Id.* ¶ 150. Prior to Jane Doe 3 filing her complaint—which led to the interim suspension—he observed Jane Doe 3 sitting in Plaintiff's physics class with Jane Doe 2. *Id.* Jane Doe 3 was not enrolled in that class. *Id.* Plaintiff alleges that "[g]iven [Jane Doe 3]'s complete change in demeanor toward me following her discussions with [Jane Doe 2], it is clear that the [Jane Doe 3] complaint is just a further example of [Jane Doe 2]'s and/or [Jane Doe 1]'s goal to have me kicked off campus." *Id.* ¶ 136. He also alleges that "[Jane Doe 3] has been orchestrating a campaign to level as many charges against [him] as possible to derail any hope he has of graduating on time" and created an Instagram account dedicated to defaming Plaintiff. *Id.* ¶ 150.

Defendant argues that an interim suspension is not a disciplinary outcome. Def.'s Mem. at 30–32. But Defendant cites no supporting cases. The First Circuit evaluated a challenge to an interim suspension pending a disciplinary hearing in *Haidak v. University of Massachussetts*, 933 F.3d 56 (2019). The First Circuit noted that "[w]hile it lasts, a suspension more or less deprives a student of all the benefits of being enrolled at a university." *Id.* at 71. The First Circuit found that in this

context, under the Due Process clause, the opportunity to be heard requires "some kind of hearing." *Id.* (citing *Gross v. Lopez*, 419 U.S. 565, 579 (1975)).  Of course, Columbia's disciplinary proceedings, unlike those of a public university, are not subject to constitutional due process requirements.  *See Menaker*, 935 F.3d at 34 n.50 ("In recognizing that a clearly irregular investigative or adjudicative process may (when combined with other factors) create a plausible inference of sex discrimination, we do not, of course, incorporate the Due Process Clause of the Fourteenth Amendment into the [disciplinary] decisions of private universities.").  But the Court agrees with the First Circuit's characterization that an interim suspension deprives a student of the benefits of education.  And while here, Plaintiff was eventually permitted to receive notes and take his exams from a remote location, he had to appeal the initial order to obtain those accommodations from Columbia. Plaintiff alleges that even with those accommodations, he was deprived of many of the benefits of a Columbia education.  Accordingly, the Court sees no reason not to treat Plaintiff's interim suspension as a disciplinary outcome for purposes of Title IX.

Together, the lack of a hearing and evidentiary weaknesses cast "some articulable doubt on the accuracy of the outcome of the . . . proceeding."  *Yusuf*, 35 F.3d at 715.  As the Second Circuit has emphasized, "[t]he pleading burden in this regard is not heavy."  *Id.*  Plaintiff has met it here.

### *ii. Minimal Plausible Inference of Gender Bias*

Plaintiff alleges procedural irregularities, evidentiary weaknesses, and that Columbia was under pressure to refute criticisms circulating in the student body that it was turning a blind eye to female students' charges of gender-based misconduct by male students.  Because the allegations of bias in this case are similar to those found to be adequate in *Doe v. Columbia*, the Court concludes that Plaintiff has plausibly alleged a minimal inference that Columbia was biased during the disciplinary proceedings, and that this bias was because of Plaintiff's gender.

As the Court has explained in the previous section, Plaintiff has alleged procedural irregularities: namely, that Columbia imposed the suspension with no prior notice and no hearing. Plaintiff also asserts that Columbia ignored evidence Plaintiff put forward in his appeal of the interim suspension that, he alleges, contradicted Jane Doe 3's version of events, and that Columbia failed to consider evidence that some of the Jane Does were working together to get Plaintiff removed from campus. Compl. ¶¶ 136, 150. These deficiencies are similar to those that the Second Circuit found indicative of a biased proceeding in *Doe v. Columbia*, which included ignoring the plaintiff's complaints of retaliatory behavior and reaching conclusions without reconciling contradictory evidence. 831 F.3d at 56–57; *see also Feibleman*, 2020 WL 882429, at *9. Thus, the alleged procedural irregularities in this case, when viewed in the light most favorable to Plaintiff, support an inference that Columbia was biased against Plaintiff.

Plaintiff must next allege facts supporting a plausible inference that the bias against Plaintiff was based on gender. On this issue, Plaintiff's allegations also track those in *Doe v. Columbia*. As in that case, the plaintiff is a male student who is alleged to have committed gender-based misconduct against female students, and who accuses the university of adopting anti-male bias due to public pressure. *See Columbia*, 831 F.3d at 57–58 ("The Complaint alleges that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students . . . .").

Plaintiff broadly alleges that Columbia was still under this kind of public pressure at the time it was investigating and adjudicating the Jane Doe complaints against him. Am. Compl. ¶ 102–104. He points to several specific factual circumstances in support of the allegation. First, Plaintiff points to ongoing student activism around sexual assault in the years leading up to and during 2017.

Plaintiff alleges that Emma Sulkowicz's visual arts senior thesis *Mattress Performance (Carry That Weight)*, which "brought the scrutiny of national media" was a "particularly fraught moment in the conversation regarding campus sexual assault at Columbia." *Id.* ¶ 104. In a 2014 interview, Ms. Sulkowicz said, "It frustrates me that No Red Tape, the Coalition Against Sexual Violence, and so many other people are working our butts off to create as comprehensive a set of policy changes as we can—which we gave to the Columbia administration—but they haven't listened to us." *Id.* ¶ 103 n.96. Plaintiff alleges that in the wake of this moment, Columbia was sensitive to this criticism and "eager to indulge" the "opinions" of campus activists. *Id.* ¶ 104. Although that was a few years before the complaints and investigations at issue here, Plaintiff alleges that the pressure, and Columbia's sensitivity to it, continued: in March of 2017, No Red Tape requested that Columbia "change their gender-based misconduct policy." *Id.* ¶ 103. Columbia "acquiesced just three months later." *Id.* Plaintiff alleges that "Columbia submitted to pressure in 2017-2018 from #MeToo# [sic] and NRT [No Red Tape]." *Id.* As in *Columbia*, it is plausible that, as Plaintiff alleges, Columbia was sensitive to this criticism and that it was thus motivated to favor female complainants over a male respondent, to protect Columbia from further accusations that it had failed to protect female students from gender-based misconduct. *See Columbia*, 831 F.3d at 57.

Second, Plaintiff points to an article in a campus news publication, *Bwog*, that was published in February of 2018, while two of the Jane Doe investigations were ongoing. The subject of the *Bwog* article was "a gender-based misconduct investigation in which the respondent in a member of the SGB [Student Governing Board] leadership, and one of the complainants is a member of No Red Tape." *Id.* ¶ 123. Columbia was aware of this article because Plaintiff contacted Columbia prior to the article's publication and advised it that the article would interfere with his privacy and the confidentiality of the disciplinary proceedings. *Id.* ¶ 123. Those facts—the publication of an article reporting that Plaintiff, a student government leader, was being investigated for Title IX

violations and that one of the complaints against him had been made by a campus activist—

plausibly support an inference that public pressure and criticism impacted the way Columbia treated

male respondents in general and Plaintiff in particular, and motivated Columbia to treat Plaintiff

more harshly.

Taken together, the allegations are evidence of some public pressure on Columbia to

disfavor male respondents like Plaintiff during the Title IX process.  "When combined with clear

procedural irregularities," as it is here, even this "minimal evidence of pressure on the university to

act based on invidious stereotypes will permit a plausible inference of sex discrimination."  *Menaker*,

935 F.3d at 33.  Accordingly, Plaintiff has stated an erroneous outcome claim.

### b. Selective Enforcement in Imposing Interim Suspension

Plaintiff has failed to state a selective enforcement claim regarding his interim suspension

because none of the Jane Does 1–3 is a similarly situated student who was treated differently from

Plaintiff.

#### i. Similarly Situated Student Treated Differently

Plaintiff argues that Jane Does 1–3 are similarly situated students of the opposite sex who

were treated better than Plaintiff.  He argues that those Jane Does are similarly situated to Plaintiff

"because they were the subject of Plaintiff's counter-complaint."  Pl.'s Opp'n at 38.  Columbia

argues that Plaintiff and those Jane Does are not similarly situated because Plaintiff, as a student

facing complaints of sexual assault from four different students, was not similarly situated to Jane

Does 1–3, who each faced a complaint from one complainant:  Plaintiff.  Unlike Plaintiff, Jane Does

1–3 were not subject to interim suspensions.

It appears that the parties disagree about the degree of similarity that must be pleaded.  In

*Doe v. New York University*, the court stated in its opinion granting the motion to dismiss that in the

context of a Title IX challenge to a school disciplinary proceeding, "similarly situated members of

the opposite sex" meant "members of the opposite sex facing comparable disciplinary charges." 438

F. Supp. 3d at 182 (quoting *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397 415–16 (N.D.N.Y. 2019)).

Similarly, in *Yu v. Vassar College*, the court explained that "[a male plaintiff] must demonstrate that a

female was in circumstances sufficiently similar to his own and was treated more favorably by the

University." 97 F. Supp. 3d at 480 (alteration in original) (quoting *Mallory*, 76 F. App'x at 634). But

as plaintiffs in both of these cases did not propose a comparator, neither case considers what degree

of similarity is required for the plaintiff to allege "comparable disciplinary charges" or

"circumstances" that are "sufficiently similar."

As this Court noted in *Doe v. NYU*, 2021 WL 12266384 (GHW) (S.D.N.Y. Mar. 31, 2021),

there is dearth of law about this particular issue in the Title IX context in this Circuit. Accordingly,

the Court looks to Title VII case law to determine what degree of similarity is required at this stage

in the litigation. To assert a Title VII claim, a plaintiff must allege that "she was similarly situated in

all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin*

*Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d

Cir. 2000)). "The plaintiff's and comparator's circumstances must bear a 'reasonably close

resemblance,' but need not be 'identical.'" *Id.* (quoting *Graham*, 230 F.3d at 40). In the context of

employee discipline, courts consider whether the comparators' offenses were of "comparable

seriousness," which "requires—in addition to an examination of the acts—an examination of the

context and surrounding circumstances in which those acts are evaluated." *Graham*, 230 F.3d at 40.

"Ordinarily, '[w]hether two employees are similarly situated . . . presents a question of fact,' rather

than a legal question to be resolved on a motion to dismiss." *Brown*, 756 F.3d at 230 (alterations in

original) (quoting *Graham*, 230 F.3d at 39). On a motion to dismiss, a court must "determine

whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately

determine that the comparators are similarly situated." *Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 436 (S.D.N.Y. 2019) (quoting *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 319 (S.D.N.Y. 2014)).

Based on the allegations in the Complaint, it is not plausible that a jury could determine that any of Jane Does 1–3 and Plaintiff are similarly situated. At the time Columbia imposed the interim suspension, Plaintiff faced multiple allegations of sexual assault from four different students. Jane Does 1–3 faced allegations of harassment (Jane Does 1–3) and sexual misconduct (Jane Doe 1) from one student. That is a material difference. It makes sense that a school might respond differently in imposing interim measures on a student who is facing complaints from multiple students than a student who is facing a complaint from one student.[1] Such students are not students facing "similar disciplinary charges." They are in materially different positions. Accordingly, Plaintiff has failed to state a selective enforcement claim.

*ii. Minimal Plausible Inference of Gender Bias*

For the reasons discussed in Section II(B)(1)(a)(ii), Plaintiff has stated a minimal plausible inference of gender bias. But because he has not alleged a similarly situated student who was treated more poorly than he was, he has not stated a claim for selective enforcement.

### c. *Davis* Harassment in Imposing Interim Suspension

Under Title IX, educational institutions may be held liable for "deliberate indifference to known acts of harassment" perpetrated by one student against another, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999), or by a teacher against a student, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1998). For a school to be held liable for such harassment, it must be "deliberately indifferent to sexual harassment, of which [it had] actual knowledge, that is so severe,

---

[1] Indeed, Columbia told Plaintiff that it imposed the interim suspension "based on the fact that you are involved in multiple pending Title IX investigations" and that it was particularly unwilling to reconsider the suspension "in light of the fact that since you were first placed on interim suspension there has been an additional case filed against [you]." Compl. ¶ 144.

pervasive, and objectively offensive that it can be said to deprive the victims of access to the

educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. The

harassment forming the basis for a Title IX claim must also, of course, be "gender-oriented." *Id.* at

651.

> Here, Plaintiff alleges that:

> [Plaintiff] was subjected to a campaign of sexual harassment because of his male
> gender. After Jane Doe 1 filed her complaint, Columbia administrators solicited
> complaints from Jane Doe 2, Jane Doe 3 and Jane Doe 4 and imposed an interim
> suspension on [Plaintiff] and treated him as a serial rapist that [sic] the facts did not
> warrant. Columbia investigated Jane Doe 2's case even though Jane Doe 2 requested
> that there not be such an investigation, and Columbia allowed [Plaintiff] to be
> subjected to ridicule and significantly lowered standing with his fellow students from
> the publication of the [B]wog article.

Compl. ¶ 210. Plaintiff alleges that he was deprived of both academic and non-academic educational

opportunities as a result of this indifference. *Id.*

Plaintiff does not plausibly allege any facts indicating that he was subject to harassment. A

school's investigation of complaints regarding alleged sexual assault is not harassment per se.

Plaintiff identifies no authority to support the proposition that investigating an allegation of sexual

assault constitutes harassment.

Nor does the publication of the *Bwog* article constitute harassment. All Plaintiff has alleged

about the content of the article is that it states that "one of the complainants is a member of NRT,"

indicating that there was more than one proceeding against Plaintiff. *Id* ¶ 125. The Complaint does

not allege sufficient facts to permit the Court to infer that the publication of the article constitutes

harassment. The use of gendered slurs can form a basis for a peer harassment claim under Title IX.

*See, e.g.*, *Doe v. East Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir.2006) (female student who

reported being raped was verbally abused by other students who called her "a slut" and "a whore,"

names that "reflect[ed] sex-based stereotypes"); *Riccio v. New Haven Bd. of Educ.*, 467 F.Supp.2d 219,

222–23 (D. Conn. 2006) (harassing students called female student names including "bitch" and "dyke," and threw objects at her).  But Plaintiff does not allege that the *Bwog* article contained any such language:  according to the Complaint, all the article did was report—accurately—that Plaintiff (who was not named) was named as a "respondent" in two GMB complaints.  That is the operation of a free press, not harassment.

Accordingly, Plaintiff has failed to plead a deliberate indifference claim with respect to his interim suspension.

### d. Erroneous Outcome in the Jane Doe 1 Proceeding

Under New York law, "[t]he doctrine of collateral estoppel 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same.'"  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir.1995) (alteration in original) (quoting *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 500 (1984)).  Collateral estoppel applies only where "'(1) 'the issue must have been material to the first action or proceeding and essential to the decision rendered therein' and (2) 'the party against whom collateral estoppel is asserted [must have been] afforded a full and fair opportunity in the prior . . . proceeding to contest the decision now said to be controlling . . . .'"  *Id.* at 1457 (first and third alterations in original) (quoting *Ryan*, 62 N.Y.2d at 500–01); *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir.1991); *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455–56 (1985).  The party seeking the benefit of collateral estoppel bears the burden of proving that the issues involved in a prior proceeding and those raised currently are identical, while the opponent of preclusion has the burden of proving the absence of a full and fair opportunity to litigate the issue in the prior proceeding.  *Khandhar*, 943 F.2d at 247–48; *Kaufman*, 65 N.Y.2d at 456; *Ryan*, 62 N.Y.2d at 501.

Here, Defendant argues that "Plaintiff previously had a full and fair opportunity to litigate Columbia's compliance with its GBM Policy and the accuracy of the Jane Doe 1 proceeding's outcome." Def.'s Mem. at 31. "Specifically, Plaintiff is collaterally estopped from re-litigating that Columbia failed to consider the expert report he procured to support his own claim of incapacitation, ¶ 157; unreasonably declined to investigate his claim of Sexual Exploitation, ¶ 224; improperly concluded that Jane Doe 1 withdrew consent, ¶ 159; and applied a different standard in determining his credibility as opposed to Jane Doe 1, ¶ 158." *Id.* at 31–32; *see also Doe v. Columbia Univ.*, 2020 WL 999006, at \*6–7 (rejecting Plaintiff's arguments).

Plaintiff's briefing fails to respond to Defendant's arguments in favor of the dismissal of his erroneous outcome claim as to the Jane Doe 1 case, and the Court will thus consider that claim conceded. *See AT & T Corp. v. Syniverse Techs., Inc.*, No. 12 Civ. 1812 (NRB), 2014 WL 4412392, at \*7 (S.D.N.Y. Sept. 8, 2014) (finding that plaintiff's "silence concedes the point" where it failed to discuss opponent's argument in its opposition brief); *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at \*11 (S.D.N.Y. Sept. 28, 2012) (same); *see also Jennings v. Hunt Cos.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) ("A district court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted)).

### e. Selective Enforcement in the Jane Doe 1 Proceeding

Plaintiff has stated a selective enforcement claim regarding the Jane Doe 1 disciplinary proceedings because Jane Doe 1 is a similarly situated student who was treated differently than Plaintiff and because he has pleaded a minimal inference of gender bias.

#### *i. Similarly Situated Student Treated Differently*

Plaintiff argues that Jane Doe 1 is a similarly situated student of the opposite sex who was treated better than Plaintiff. Based on the allegations in the Complaint, it is plausible that a jury

could determine that Jane Doe 1 and Plaintiff are similarly situated with respect to the disciplinary proceeding Plaintiff faced regarding Jane Doe 1.  Jane Doe 1 filed a complaint against Plaintiff for sexual assault.  Compl. ¶ 114.  Similarly, Plaintiff filed a complaint against Jane Doe 1 for sexual misconduct and sexual exploitation.  *Id.* ¶ 119.  Plaintiff alleges that Columbia did not even ask Jane Doe 1 any questions about the allegations and refused to investigate his report.  *Id.* ¶ 150.  When Jane Doe 1 accused him of sexual assault, on the other hand, Columbia thoroughly investigated Jane's allegations, including interviewing Jane Doe 1, Plaintiff, and Jane Doe 1's friends.  *Id.* ¶ 156.  These circumstances bear a reasonably close resemblance:  Plaintiff and Jane Doe 1 both faced allegations of sexual assault for their conduct on December 13, 2017.  Depending on the results of discovery, an examination of the context in which the students' acts were evaluated could plausibly yield the conclusion that they involved sufficiently similar circumstances or that they faced comparable disciplinary charges.  The Court notes that Plaintiff is plausibly similarly situated with respect to Jane Doe 1 for this purpose but not for the purpose of the imposition of the interim suspension, which happened only after Plaintiff was facing Title IX complaints from three different students.

### *ii. Minimal Plausible Inference of Gender Bias*

Plaintiff alleges procedural irregularities and, as the Court has explained above in section II(C)(a)(ii), that Columbia was under pressure to refute criticisms that it was turning a blind eye to female students' charges of gender-based misconduct by male students.  As the Court explained above with respect to procedural irregularities, Plaintiff is collaterally estopped from re-litigating that Columbia failed to consider the expert report he procured to support his own claim of incapacitation, unreasonably declined to investigate his claim of Sexual Exploitation, improperly concluded that Jane Doe 1 withdrew consent, and applied a different standard in determining his credibility as opposed to Jane Doe 1.  But Plaintiff has alleged additional procedural irregularities,

and he is not estopped from litigating them.  Because the allegations of bias in this case are similar to those found to be adequate in *Doe v. Columbia*, the Court concludes that Plaintiff has plausibly alleged a minimal inference that Columbia was biased during the disciplinary proceedings regarding Jane Doe 1, and that this bias was because of Plaintiff's gender.

Plaintiff has alleged several other procedural irregularities indicating that Columbia was biased against him during the investigation and adjudication of the Jane Doe 1 complaint.  He alleges that Columbia ignored evidence contradicting Jane Doe 1's version of events, such as the photographic evidence Jane Doe 1 herself submitted.  Compl. ¶ 157.  He also alleges that Columbia refused to investigate his claim regarding Jane Doe 1's sexual misconduct or consider evidence indicating that she and Jane Doe 3 were attempting to work together to prevent Plaintiff from graduating.  *Id.* ¶¶ 148, 150.  These procedural deficiencies are similar to those that the Second Circuit found indicative of a biased proceeding in *Doe v. Columbia*, which included refusing to interview witnesses who could have corroborated the plaintiff's account, ignoring the plaintiff's complaints of retaliatory behavior, and reaching conclusions without reconciling contradictory evidence.  831 F.3d at 56–57; *see also Feibleman*, 2020 WL 882429, at *9.  Thus, the alleged procedural irregularities in this case, when viewed in the light most favorable to Plaintiff, support an inference that Columbia was biased against Plaintiff.

Plaintiff must next allege facts supporting a plausible inference that the bias against Plaintiff was based on gender.  For the reasons discussed in Section II(C)(2)(a)(ii), Plaintiff's allegations are evidence of some public pressure on Columbia to disfavor male respondents like Plaintiff during the Title IX process.  "When combined with clear procedural irregularities," as it is here, even this "minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination."  *See Menaker*, 935 F.3d at 33.  Accordingly, Plaintiff has stated a minimal plausible inference of gender bias.

**f. Erroneous Outcome in the Jane Doe 4 Proceeding**

Because Plaintiff has alleged facts sufficient to cast some articulable doubt on the Jane Doe 4 proceeding, and circumstances giving rise to a minimal plausible inference of discriminatory intent by Columbia, Plaintiff has stated an erroneous outcome claim with respect to the Jane Doe 4 proceeding.

*i. Facts Sufficient to Cast Some Articulable Doubt*

As with the interim suspension, Plaintiff has alleged both procedural flaws and evidentiary weaknesses.  Plaintiff alleges that Columbia ignored the fact that the "text messages between [Plaintiff] and [Jane Doe 4] indicate that [Plaintiff] 'ceased the idea' of having sex that morning, which means [they] never had it."  Compl. ¶ 175 (second alteration in original).  Plaintiff also alleges that Columbia held him and Jane Doe 4 to different standards in evaluating the evidence: "Columbia . . . left Jane Doe 4's numerous assumptions about facts unexamined, whereas they ensured everything John Doe said was corroborated or documented.  Columbia also included hearsay and gossip under the guise of testimony."  *Id.* ¶ 174.  Those facts are sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding.

*ii. Minimal Plausible Inference of Gender Bias*

Plaintiff alleges procedural irregularities and, as the Court has explained above, that Columbia was under pressure to refute criticisms that it was turning a blind eye to female students' charges of gender-based misconduct by male students.  Because the allegations of bias in this case are similar to those found to be adequate in *Doe v. Columbia*, the Court concludes that Plaintiff has plausibly alleged a minimal inference that Columbia was biased during the disciplinary proceedings regarding Jane Doe 4, and that this bias was because of Plaintiff's gender.

As with his claims regarding the interim suspension, Plaintiff has alleged procedural irregularities indicating that Columbia was biased against Plaintiff during the investigation and

adjudication of the Jane Doe 4 complaint.  He alleges that Columbia ignored evidence contradicting Jane Doe 4's version of events, such as text messages indicating that he and Jane Doe 4 did not have sex on the date in question, and that Columbia "included hearsay and gossip under the guise of testimony."  *Id.* ¶ 175.  He also alleges that the panel held him and Jane Doe 4 to different standards: they were "quick to criticize" Plaintiff's statements as inconsistent, but "very forgiving of [Jane Doe 4]'s admitted lack of 'independent memory' of events just prior" to the alleged sexual assault.  *Id.* Here, again, the alleged procedural irregularities in this case, when viewed in the light most favorable to Plaintiff, support an inference that Columbia was biased against Plaintiff.

And for the reasons discussed in Section II(C)(2)(a)(ii), Plaintiff's allegations are evidence of some public pressure on Columbia to disfavor male respondents like Plaintiff during the Title IX process.  "When combined with clear procedural irregularities," as it is here, even this "minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination."  *See Menaker*, 935 F.3d at 33.  Accordingly, Plaintiff has stated a minimal plausible inference of gender bias.

### g. Erroneous Outcome in the Jane Doe 3 Proceeding

Because Plaintiff has alleged facts sufficient to cast some articulable doubt on the Jane Doe 3 proceeding, and circumstances giving rise to a minimal plausible inference of discriminatory intent on the part of Columbia, Plaintiff has stated an erroneous outcome claim with respect to that proceeding.

*i. Facts Sufficient to Cast Some Articulable Doubt*

Plaintiff alleges both evidentiary weaknesses and procedural flaws in the Jane Doe 3 proceeding.  Plaintiff alleges that when Columbia interviewed him, "the investigator ignored facts indicating that Jane Doe 3 had initiated all sexual contact with [Plaintiff] in November 2017 without obtaining affirmative consent from [Plaintiff] and rather questioned [Plaintiff] about whether or not

[Plaintiff], subjectively, believed that such sexual activity was consensual." Compl. ¶ 149. Plaintiff alleges that he and Jane Doe 3 were held to different standards: when Jane Doe 3 mixed up dates, Columbia said that this was reasonable "[c]onsidering the length of the relationship and number of sexual acts occurring within this period." *Id.* ¶ 184. But "this assumption [was] not equally provided to [Plaintiff] for minor discrepancies in [hi]s memory about events leading up to the incident at issue ,years after the fact." *Id.* Plaintiff also alleges that Columbia failed to consider whether Jane Doe 3 had ulterior motives, even though she created an Instagram page that was "dedicated to slandering [Plaintiff]" and "ha[d] been orchestrating a campaign to level as many charges against [Plaintiff] as possible to derail any hope he ha[d] of graduating on time." *Id.* ¶ 150. Those facts are sufficient to cast some articulable doubt on the accuracy of the Jane Doe 3 proceeding.

*ii. Minimal Plausible Inference of Gender Bias*

Plaintiff alleges procedural irregularities and, as the Court has explained above, that Columbia was under pressure to refute criticisms that it was turning a blind eye to female students' charges of gender-based misconduct by male students. Because the allegations of bias in this case are, again, similar to those found to have been adequate in *Doe v. Columbia*, the Court concludes that Plaintiff has plausibly alleged a minimal inference that Columbia was biased during the disciplinary proceedings regarding Jane Doe 3, and that this bias was because of Plaintiff's gender.

Plaintiff has alleged procedural irregularities indicating that Columbia was biased against Plaintiff during the investigation and adjudication of the Jane Doe 3 complaint. He alleges that Columbia ignored evidence contradicting Jane Doe 3's version of events, such as evidence indicating that Jane Doe 3 initiated all sexual contact with Plaintiff in November 2017 without obtaining affirmative consent. He alleges that Columbia refused to investigate indications that Jane Doe 3 was "orchestrating a campaign to level as many charges as possible" against Plaintiff. Compl. ¶ 150. He also alleges that "the demeanor of the panelists throughout the hearing implied they could barely be

bothered to listen, and [they] looked as if their minds were already made up" and that "the tone of their letter reveal[ed] a deep antagonism toward [him]." *Id.* ¶ 184. These procedural deficiencies, when viewed in the light most favorable to Plaintiff, support an inference that Columbia was biased against Plaintiff.

And for the reasons discussed in Section II(C)(2)(a)(ii), Plaintiff's allegations are evidence of some public pressure on Columbia to disfavor male respondents like Plaintiff during the Title IX process. "When combined with clear procedural irregularities," as it is here, even this "minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *See Menaker*, 935 F.3d at 33. Accordingly, Plaintiff has stated a minimal plausible inference of gender bias.

## III. LEAVE TO AMEND

The Court grants Plaintiff leave to replead the dismissed Title IX claims to the extent that they are not precluded under the doctrines of res judicata or collateral estoppel. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014). Repleading matters precluded under the doctrines of res judicata or collateral estoppel would be futile. Therefore, leave is denied to replead these aspects of Plaintiff's claims. Otherwise, the Court grants leave to replead the dismissed claims. Any amended complaint must be filed no later than fourteen days from the date of this order.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED as to Plaintiff's claims for injunctive relief and damages arising from his expulsion and lack of diploma, Plaintiff's

selective enforcement and *Davis* harassment claims regarding his interim suspension, and Plaintiff's erroneous outcome claim as to the Jane Doe 1 proceeding; it is DENIED as to all other claims.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 27.

SO ORDERED.

Dated:  August 1, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge