USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/28/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
JOHN DOE,                                          :
                                                   :
                              Plaintiff,           :
                                                   :          1:20-cv-06770-GHW
              -against-                             :
                                                   :          MEMORANDUM OPINION
COLUMBIA UNIVERSITY,                               :             AND ORDER
                                                   :
                              Defendant.           :
------------------------------------------------------------- X

GREGORY H. WOODS, District Judge:

    Plaintiff John Doe and Jane Does 1–4 were all students at Defendant Columbia University.

During the course of Plaintiff's senior year, each of Jane Does 1–4 filed complaints alleging that

Plaintiff had sexually assaulted them in violation of Columbia's Gender-Based Misconduct Policy.

In response to each of those complaints, Columbia began a disciplinary process against Plaintiff.

Because Plaintiff was a member of the student government and one of the Jane Does was a member

of a student group advocating for Columbia to take sexual assault on campus more seriously, a

campus news site published an article about the complaints.  After the third complaint was filed,

Columbia—without giving Plaintiff notice or a hearing—placed him on an interim suspension.

Plaintiff filed a counter-complaint against Jane Doe 1 for sexual misconduct and against Jane Does

1–3 for harassment and retaliation, which Plaintiff alleges Columbia failed to investigate.  In the

midst of those disciplinary proceedings, Plaintiff was expelled from Columbia for email hacking.

Ultimately, following his expulsion, Columbia found that Plaintiff had violated its Gender-Based

Misconduct Policy with respect to Jane Doe 1, Jane Doe 3, and Jane Doe 4.  Plaintiff was found not

responsible with respect to Jane Doe 2.

    Plaintiff challenged his expulsion for email hacking and the Jane Doe 1 and 4 proceedings in

Article 78 actions in state court.  He was unsuccessful.  Plaintiff then filed this lawsuit, bringing

seven claims under Title IX of the Education Amendments of 1972.  In August 2021, the Court granted in part and denied in part Columbia's motion to dismiss Plaintiff's case.  Plaintiff now files an Amended Complaint, which Columbia has moved to dismiss as to those aspects of Plaintiff's claims that were dismissed in the Court's previous order.

Because Plaintiff was not given leave to replead claims barred by res judicata and collateral estoppel in the Court's August 2021 order, those claims remain dismissed.  Additionally, while the Amended Complaint sufficiently alleges that Plaintiff has Article III standing to pursue his claims for injunctive relief stemming from his expulsion and lack of diploma, Plaintiff's claims respecting that relief nonetheless remain dismissed because the Court is barred by res judicata from disturbing the Article 78 court's decision on that issue.  Plaintiff has also failed to plausibly allege the existence of a similarly situated student who was treated better than he in the context of his interim suspension, so his selective enforcement claim challenging the interim suspension fails.  And because Plaintiff has not sufficiently alleged that Columbia was deliberately indifferent towards any gender-based peer harassment towards him, he has not stated a *Davis* harassment claim. Accordingly, Defendant's motion to dismiss Plaintiff's previously dismissed claims is GRANTED.

# I. BACKGROUND

## A. Facts[1]

Plaintiff John Doe ("Plaintiff") was a student at Defendant Columbia University in the City of New York ("Defendant" or "Columbia"). Dkt. No. 41 ("Am. Compl.") ¶¶ 1, 7.  During the 2017–2018 school year, Plaintiff was named as a respondent in multiple complaints alleging that he had violated Columbia's Gender-Based Misconduct Policy.

---

[1] The facts are drawn from Plaintiff's amended complaint.  Dkt. No. 41 ("Am. Compl.").  For this motion, the Court must accept as true the facts alleged in the amended complaint.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 1. Columbia's GBM Policy

Columbia's Gender-Based Misconduct Policy prohibits non-consensual sexual conduct, including "Sexual Assault: Intercourse," "Sexual Assault: Contact," "Dating Violence," "Sexual Exploitation," "Gender-Based Harassment," and "Sexual Harassment." Dkt. No. 31 Ex. 1, Def's Br. in Supp. Ex. A (the "GBM Policy" or the "GBM"), at 4–6. It also prohibits retaliation against someone who has reported a gender-based misconduct complaint or has been the subject of a gender-based misconduct complaint. *Id.* at 7.

The GBM Policy outlines the procedures for investigating and resolving complaints of gender-based misconduct. When Columbia's Gender-Based Misconduct Office (the "GBM Office") receives a report of a violation, it "conducts an initial assessment to evaluate whether, if substantiated, the conduct constitutes a Policy violation and whether there is a reasonable basis to engage the disciplinary process." *Id.* at 21. After a report is made, "[t]he University may also take interim measures to ensure the safety of all parties involved and to protect the integrity of the ongoing disciplinary process." *Id.*

In the investigation process, Columbia "will designate a two-person team . . . to conduct an investigation into whether a violation of the Policy occurred." *Id.* at 25. The investigative team "will speak to each party in detail about the allegation(s) and ask each party to provide a list of witnesses and/or any relevant documents or evidence to be considered." *Id.* The team "has the discretion to determine the relevance of any proffered witness and/or evidence and determine that certain witnesses and/or evidence should be included or excluded in the investigative process in light of the allegations and/or Policy set out here." *Id.* At the conclusion of the initial phase of the investigation, the investigative team "will provide to the Complainant and the Respondent, in writing, a Notice of Final Charges, which will include a description of the alleged Policy violation(s) that will be considered during the hearing process, if applicable." *Id.* at 27. The investigative team

"will then prepare a report based on interview summaries, witness statements and other documents gathered during the investigation" and "will provide a redacted and watermarked copy of the report to the Complainant, Respondent, and/or their respective advisors for their review." *Id.* The parties may respond to the report's factual summary, provide additional information, and challenge its factual accuracy. *Id.* Throughout the process, students are entitled to an advisor, and may submit questions for the investigative team to pose to others as part of the investigation. *Id.* at 17, 27.

After the investigative team prepares its final report and makes a responsibility determination with respect to each party, either party may request a hearing. *Id.* at 28. The hearing panel then evaluates all relevant information in the investigative report and determines, based on a preponderance of the evidence, whether a GBM Policy violation occurred. *Id.* If the hearing panel finds a student responsible, the matter proceeds to a sanctions phase. *Id.* at 31. Either party may appeal the hearing decision, the sanction, or both. *Id.*

### 2. The Environment at Columbia

Plaintiff makes many allegations regarding Columbia's gender bias. The Court will highlight the ones that are most significant in the Court's analysis. Plaintiff alleges that the GBM complaints at issue here and Columbia's investigation and resolution of those complaints took place against a backdrop of pressure on Columbia to take sexual assault more seriously and to crack down on perpetrators of sexual assault on campus.

In 2014, Emma Sulkowicz's visual arts senior thesis *Mattress Performance (Carry That Weight)* "brought the scrutiny of the national media" to Columbia's handling of sexual assault on campus. Am. Compl. ¶ 106. Plaintiff alleges that this was a "particularly fraught moment in the conversation regarding campus sexual assault at Columbia." *Id.* One of the student groups putting pressure on Columbia to tighten its sexual assault policies was called "No Red Tape." *Id.* ¶ 105. Ms. Sulkowicz said, "[i]t frustrates me that No Red Tape, the Coalition Against Sexual Violence, and so many other

people are working our butts off to create as comprehensive a set of policy changes as we can—which we gave to the Columbia administration—but they haven't listened to us." *Id.* ¶ 105 n.100. Plaintiff alleges that in the wake of that moment, Columbia was "eager to indulge" the opinions of campus activists. *Id.* ¶ 106.

Plaintiff alleges that this pressure did not let up. In March of 2017, No Red Tape requested that Columbia "change their gender-based misconduct policy." *Id.* ¶ 105. Columbia "acquiesced just three months later." *Id.* Plaintiff alleges that "Columbia submitted to pressure in 2017–2018 from #MeToo[] and N[o] R[ed] T[ape]." *Id.*

### 3. GBM Incidents, Complaints, and Counter-Complaints

Four GBM complaints were filed against Plaintiff during the 2017–2018 school year, when Plaintiff was a senior at Columbia. Am. Compl. ¶ 162. Between December 2017 and March 2018, each of Jane Does 1–4 filed separate complaints alleging that Plaintiff had engaged in various types of sexual misconduct in violation of the GBM. *Id.* ¶¶ 115, 120, 132, 135. During that time, Plaintiff also filed a counter-complaint against Jane Doe 1 for sexual misconduct and sexual exploitation, and a counter-complaint against Jane Does 1–3 for harassment and retaliation. *Id.* ¶¶ 121, 134, 152.

### a. Jane Doe 1

In the early morning hours of December 13, 2017, Plaintiff met Jane Doe 1 at a fraternity party. *Id.* ¶ 109. They left the party together. *Id.* Plaintiff was heavily intoxicated when he left the party, and initially did not remember anything until "waking up in someone else's bed without memory of with whom he was in bed, where he was, and that he left and returned to his room in his residence hall." *Id.* ¶ 111.

Later that morning, Jane Doe 1's roommate sent Jane Doe 1 a text message asking if Jane Doe 1 had "hooked up" with Plaintiff. *Id.* ¶ 113. Jane Doe 1 responded "yeah but it was so bad lmao." *Id.* Her roommate asked, "Was he too drunk lol;" Jane Doe 1 responded, "No it just was

questionably non-consensual at points on my end." *Id.* Jane Doe 1 texted a different friend about

the encounter as well, stating that she "hooked up with this idiot beta man last night. and it turned

non-consensual on my end at the end bc it was painful and bad and was going on forever and he

didn't use a condom? which i knew but also wtf and i think he finished?" *Id.* Jane Doe 1 wrote,

"i'm okay i'm just mad at myself also for not being more assertive when i was saying stop" and, "i

wasn't very loud but I also was like literally squirming away." *Id.*

That day, Jane Doe 1 asked a friend who knew Plaintiff to find out what Plaintiff knew

about what had happened during their encounter. *Id.* ¶ 114. Plaintiff told Jane Doe 1's friend that

he could only remember having too many drinks and waking up next to a stranger. *Id.* Jane Doe 1's

friend accused Plaintiff of raping Jane Doe 1, but Plaintiff denied the accusation because he did not

recognize Jane Doe 1's name and did not have any memory of a sexual encounter. *Id.* The friend

returned to Jane Doe 1's dormitory and told her and her friends what Plaintiff had told him. *Id.*

Jane Doe 1 brought a gender-based misconduct complaint against Plaintiff. *Id.* ¶ 115. She

alleged that after meeting Plaintiff, she had decided to have sex with Plaintiff and that during the

sexual encounter, she had withdrawn her consent. *Id.* Jane Doe 1 recounted that she and Plaintiff

went to her residence hall on campus together. *Id.* ¶ 110. There, Plaintiff, Jane Doe 1, and Jane

Doe 1's roommate talked in the living room. *Id.* After Jane Doe 1's roommate left the living room,

Plaintiff kissed Jane Doe 1 and she led Plaintiff up to her room. *Id.* Jane Doe 1 recounted that

Plaintiff then went to take a shower, but she could not recall how long the shower lasted. *Id.* ¶ 112.

After the shower, Jane Doe 1 and Plaintiff proceed to make out, and Plaintiff performed oral sex on

Jane Doe 1 for "a few seconds or maybe a minute." *Id.* Plaintiff then had sexual intercourse with

Jane Doe, at which point Jane Doe 1 said, "Ow Ow Ow" and asked Plaintiff to "stop." *Id.* Plaintiff

acted as if he had not heard her and continued to engage in sexual intercourse. *Id.* At 6:30 a.m. that

morning, Jane Doe 1 tapped Plaintiff's shoulder and asked him to leave; Plaintiff left. *Id.* On

December 27, 2017, Plaintiff was informed of Jane Doe 1's complaint. *Id.* ¶ 116.

When Plaintiff returned to campus after winter break, he asked around to gather information

about the encounter. *Id.* Plaintiff alleges that these conversations "trigger[ed] more of a recollection

of the early hours of December 13." *Id.* At that time, he was able to recall that "he shared an Uber,

that he had been led around by someone, had sat next to two people in a living room . . . , had used

the bathroom with great difficulty, had kissed Jane Doe [1], had engaged in oral sex and had erectile

disfunction." *Id.* Jane Doe 1 had discussed her complaint with members of Plaintiff's fraternity

with whom she was friends and asked them to "oust" Plaintiff or demand his resignation from the

fraternity. *Id.* ¶ 116. On January 25, 2018, Plaintiff offered his resignation. *Id.* ¶ 119. That day,

Columbia also began its investigation of Jane Doe 1's allegations. *Id.*

On January 29, 2018, Plaintiff filed a counter-complaint of gender-based misconduct against

Jane Doe 1, alleging that Jane Doe 1 had committed sexual misconduct on December 13, 2019,

because Plaintiff had been too incapacitated from alcohol to consent to sexual conduct. *Id.* ¶ 121.

On February 26, 2018, Plaintiff amended his complaint against Jane Doe 1 to add a charge of sexual

exploitation because he remembered being given an alcoholic drink in Jane Doe 1's living room

despite his intoxicated state. *Id.* ¶ 151. On April 10, 2018, Columbia informed Plaintiff that it

would not add a charge of sexual exploitation to Plaintiff's counter-complaint against Jane Doe 1

because Plaintiff's allegations were insufficient to support the charge. *Id.*

On April 20, 2018, Columbia provided Plaintiff with a draft of the investigation report

concerning Jane Doe 1's allegations. *Id.* ¶ 149. Plaintiff expressed "his concerns about conflicts of

interest among the investigators who appeared to be ignoring the concocted nature of the story told

by Jane Doe 1 and her friends." *Id.*

On May 1, 2018, Plaintiff objected to Columbia's decision not to add a charge of sexual exploitation to Plaintiff's counter-complaint against Jane Doe 1.  *Id.* ¶ 151.  Plaintiff alleges that Columbia "did not ask [Jane Doe 1] a single question regarding [John Doe]'s Sexual Exploitation charge before dismissing its consideration from [John Doe]'s complaint."  *Id.* (alterations in original). He wrote:

> On the one hand, your office has claimed that [John Doe]'s allegations are insufficient to support the charge, yet, Columbia maintains that it did not investigate the allegations and that [Jane Doe 1] was not required to provide a response to [John Doe]'s Sexual Exploitation charge . . . .  Columbia has failed to discharge even a cursory investigation into [John Doe]'s charges against [Jane Doe 1] for Sexual Exploitation.

*Id.* (alterations in original).

### b. Jane Doe 2

Plaintiff and Jane Doe 2 had some sort of ongoing relationship—Plaintiff characterizes the relationship as a "hook-up relationship" but also describes Jane Doe 2 as his "ex-girlfriend"—that lasted from fall 2015 to mid-April 2016.  *Id.* ¶ 117.  Plaintiff alleges that their breakup "upset" Jane Doe 2.  *Id.*  In January 2018, Plaintiff and Jane Doe 2 enrolled in the same physics class.  *Id.*

At some point, Jane Doe 2 sent an email to the Title IX office, alleging that Plaintiff had raped her, asking that her allegations be investigated, and requesting that she and Plaintiff not be enrolled in the same physics class.  *Id.* ¶ 118.  On January 23, 2018, Jane Doe 2 met with Columbia's Title IX Coordinator and Associate Vice President Marjorie Fisher.  *Id.*  Ms. Fisher filed a complaint on behalf of Jane Doe 2, alleging that Plaintiff had raped Jane Doe 2 in April 2016.  *Id.*  On January 28, 2018, Jane Doe 2 herself filed a complaint against Plaintiff.  *Id.* ¶ 120.  She alleged that on April 8, 2016, Plaintiff "had non-consensual sex with Jane Doe 2 in her bed in her room when two strangers were there."  *Id.*

On February 8, 2018, Plaintiff received a no-contact order ("NCO") from Columbia, informing him that Columbia had received the complaint filed by Jane Doe 2 against Plaintiff.  *Id.*

¶ 128.  The NCO specified that Plaintiff was to "avoid contact" with Jane Doe 2, although he could continue to attend his physics class.  *Id.* ¶ 129.  On February 16, 2018, Columbia informed Plaintiff that the incident alleged in Jane Doe 2's complaint had actually occurred one day later, on April 9, 2016.  *Id.* ¶ 128.  Plaintiff denied having sexual contact with Jane Doe 2 without her consent.  *Id.* Plaintiff alleges that the NCO became more restrictive as time went on.  It later provided that Plaintiff would have to enter his physics class from another door than the one used by Jane Doe 2, enter 5 minutes after her, and sit in the back of the class, despite Plaintiff's need for glasses.  *Id.* ¶ 129.  Plaintiff alleges that those restrictions "compelled [Plaintiff] to drop his PE class" and "prevented [him] from staying after class and asking the professor questions."  *Id.*

When the restrictions were announced to Plaintiff, Jeri Henry, then the Associate Vice President of Student Conduct and Community Standards, said, "let's try this and if it doesn't work out for you or if you have any problems let us know."  *Id.*  In mid-February, Plaintiff's "concerns were met with Ms. Henry saying, 'I have better things to do than [fine-tune NCO stipulations].'"  *Id.* (alteration in original).  The restrictions remained in place until March 2, 2018, when Plaintiff was suspended.  *Id.*

### c. Plaintiff's Harassment and Retaliation Complaint Against Jane Does 1 and 2

On February 5, 2018, Plaintiff received an email from the editor-in-chief of *Bwog*, a student-run campus news website.  *Id.* ¶ 125.  Plaintiff was then a member of Columbia's Student Governing Board ("SGB") leadership.  *Id.*  The *Bwog* editor-in-chief notified the SGB leadership of an "upcoming *Bwog* article regarding a gender-based misconduct investigation in which the respondent is a member of the SGB leadership, and one of the complainants is a member of No Red Tape."  *Id.* (emphasis removed).  The *Bwog* editor-in-chief asked if SGB wanted to make a comment and noted that the article would be published at 5 p.m. that day.  *Id.*  Plaintiff contacted Columbia and advised it that the article would interfere with his privacy and the confidentiality of the disciplinary

proceedings.  *Id.* ¶ 126.  Ms. Henry informed Plaintiff that Columbia would not prevent the publication.  *Id.*

On February 6, 2018, *Bwog* published the article.  *Id.* ¶ 127.  It reported that "a member of the Student Governing Board leadership (SGB) is currently under investigation by the Student Conducts and Community Standards (SCCS) office for multiple allegations of sexual assault" including "an alleged rape."  Dkt. No. 58 Ex. D.  The article also stated that one of the complainants was a member of NRT, indicating that there was more than one proceeding against Plaintiff, although Plaintiff at the time was only aware of Jane Doe 1's complaint.  *Id.*; Am. Compl. ¶ 127. Additionally, the website on which the article was posted permitted readers to post comments in reaction to the article; in several comments, Plaintiff's "full name [was] disclosed."  Am. Compl. ¶ 127; Dkt. No. 58 Exs. A–C.  One comment also labeled the person under investigation for sexual misconduct a "rapist."  Am. Compl. ¶ 127; Dkt. No. 58 Ex. D.  Plaintiff alleges that Jane Doe 2 and either Jane Doe 1 or Jane Doe 3 had provided confidential and defamatory information to a *Bwog* editor about the allegations made against Plaintiff by Jane Doe 1 and Jane Doe 2.  Am. Compl. ¶ 127.

On February 26, 2018, Plaintiff formally filed a complaint against Jane Doe 1 and Jane Doe 2 for harassment and retaliation arising out of the *Bwog* article.  *Id.* ¶ 134.

### d. Jane Doe 3

Plaintiff alleges that Jane Doe 3 "had been enamored with" Plaintiff and "sought to have a committed, monogamous relationship" with Plaintiff despite Plaintiff's statement that he "was not interested in the same type of relationship with her."  *Id.* ¶ 122.  At some point in 2017, Jane Doe 3 created an Instagram page "dedicated to slandering" Plaintiff, which she used to "encourage other women to make false statements defaming" Plaintiff.  *Id.*

In January 2018, Jane Doe 3 "learned about Jane Doe 1's complaint against John Doe and met with Jane Doe 2." *Id.* ¶ 123.  From late January to mid-February 2018, Jane Doe 3 accompanied Jane Doe 2 to Plaintiff's physics class and would stare at Plaintiff while "whispering about and jeering at" Plaintiff.  *Id.*

On February 5, 2018, the resident advisor and residence hall director of Jane Doe 3's residence filed an incident report stating that they had been informed by other students that Jane Doe 3 had been sexually assaulted.  *Id.* ¶ 124.  Kimia Sharifi emailed Jane Doe 3 requesting an intake meeting for a sexual misconduct complaint.  *Id.*  On February 15, 2018, Jane Doe 3 attended the intake meeting and complained that Plaintiff had sexually assaulted her on October 15, 2017, and then attempted to rape her on November 7, 2017.  *Id.* ¶ 132.

On March 2, 2018, Columbia began to investigate Jane Doe 3's allegations that Plaintiff had engaged in sexual misconduct against her on four occasions between September 14 and November 7, 2017.  *Id.* ¶ 136.  Columbia issued an NCO regarding Jane Doe 3 to Plaintiff the same day.  *Id.*  On March 26, 2018, Plaintiff was interviewed by Columbia about Jane Doe 3's complaint.  *Id.* ¶ 144.

On April 29, 2018, Plaintiff was notified in writing by Columbia that Jane Doe 3's complaint had been modified to include five allegations of sexual assault and dating violence on six dates rather than four allegations on three dates.  *Id.* ¶¶ 148, 181.  On May 1, 2018, Columbia interviewed Plaintiff for a second time.  *Id.* ¶ 150.  Plaintiff alleges that during the interview, the investigator "ignored facts indic[a]ting that Jane Doe 3 had initiated all sexual contact with [Plaintiff] in November 2017 without obtaining affirmative consent from [Plaintiff] and rather questioned [Plaintiff] about whether or not [Plaintiff], subjectively, believed that such sexual activity was consensual."  *Id.*

On April 19, 2018, Plaintiff amended his retaliation and harassment complaint to designate Jane Doe 3 as a "collaborator."  *Id.* ¶ 148.

On May 1, 2018, Plaintiff's counsel wrote a letter to Ms. Fisher, expressing his concerns about the disciplinary process:

> It is becoming clear that [Jane Doe 3] has been orchestrating a campaign to level as many charges against [John Doe] as possible to derail any hope he has of graduating on time. As [John Doe] has alleged, shortly after filing his cross-complaint against [Jane Doe 1], [Jane Doe 3] began accompanying [Jane Doe 2] to [John Doe]'s SCNC W1800 physics class, throughout late January and mid-February, a class in which [Jane Doe 3] was not enrolled. [Jane Doe 3] . . . created a fake Instagram page ("Finsta") dedicated to slandering [John Doe]. On February 8, 2018, [Jane Doe 2] brought a claim against [John Doe]. Based on Jeri Henry's correspondence dated March 23, 2018, we are now aware that on February 9, 2018, Jane Doe 3 contacted your office regarding her claim against [John Doe]. The timing of these complaint filings is not coincidental.
>
> Likewise, the connection between [Jane Doe 3] and [Jane Doe 1] is not coincidental. As you know, on December 27, 2017, [Jane Doe 1] brought a gender-based misconduct charge against [John Doe]. On January 29, 2018, [John Doe] filed a cross-complaint of gender-based misconduct against [Jane Doe 1], alleging that she engaged in sexual contact with [John Doe] while he was incapacitated due to alcohol consumption. While [Jane Doe 1]'s charge was pending, she did not claim that [John Doe] was sending text messages on the night in question. [Jane Doe 1] did not make such a claim until after [John Doe] filed his cross-complaint against [Jane Doe 1]. Suddenly, text messages exchanged between [John Doe] and [Jane Doe 3] on the night in question were submitted as evidence by [Jane Doe 1] in opposition to [John Doe]'s counter-claim. It should be noted that both [Jane Doe 3] and [Jane Doe 1] happen to know the same two fraternity brothers who were members of [John Doe]'s fraternity. Despite this suspicious connection between the two complainants, Columbia's investigators declined to interview [Jane Doe 3] about these messages (including questioning, for example, why [Jane Doe 3] provided these text messages to [Jane Doe 1] in the first place), and did not question [Jane Doe 1] regarding how she knew, specifically, [John Doe] sent text messages to [Jane Doe 3] on the night in question.

*Id.* ¶ 151 (all but the tenth alteration in original).

On May 2, 2018, Plaintiff wrote to the administrator handling his retaliation and harassment complaints to amend his formal complaint to name Jane Doe 3 as a respondent and to add additional facts. *Id.* ¶ 152. The investigator forwarded Plaintiff's amended complaint to Ms. Fisher. *Id.*

### e. Jane Doe 4

Plaintiff and Jane Doe 4 "had casually dated in late 2016 when they were juniors." *Id.* ¶ 135.

Plaintiff alleges that they never had sexual intercourse. *Id.* Jane Doe 4 was a friend and sorority

sister of Jane Doe 3. *Id.* ¶ 141. On March 1, 2018, Serena Barnett, Director of Training and

Education in Columbia's Office of Equal Opportunity and Affirmative Action, filed a report of

sexual assault on behalf of Jane Doe 4 against Plaintiff. *Id.* ¶ 135. On March 23, 2018, Plaintiff

received an NCO resulting from the allegations made by Jane Doe 4. *Id.* ¶ 141. Jane Doe 4 alleged

that on December 13, 2016, she told Plaintiff that she did not want to have sex without a condom.

*Id.* ¶ 177–78. Jane Doe 4 said that, nonetheless, Plaintiff had sex with her without a condom, and

without her consent. *Id.* ¶ 178. Plaintiff "denied that Jane Doe 4 and he had sexual intercourse on

December 13, 2016, and stated that if they had, it was consensual." *Id.* ¶ 175.

### 4. Plaintiff's Interim Suspension

On March 2, 2018, Ms. Henry, Columbia's Associate Vice President of Student Conduct and

Community Standards, asked to meet with Plaintiff. *Id.* ¶ 137. When they met, she gave Plaintiff a

letter that stated:

> Due to the seriousness of these multiple alleged violations, you are hereby interim
> suspension [sic] from Columbia University effective immediately until further notice.
> During this interim suspension, you are ineligible to participate in any Columbia
> University classes and academic or extracurricular activities . . . [Y]ou are now
> restricted from accessing all residential housing until further notice . . . [You] may
> request a prompt and reasonable review of the terms of any of the above directives
> and submit evidence in support of this request.

*Id.* Plaintiff alleges that "the interim suspension was suddenly imposed on [Plaintiff] without any

prior notice and without any kind of prior hearing." *Id.*

On March 5, 2018, Plaintiff sent a letter to Ms. Fisher appealing the interim suspension,

along with evidence to support his position. *Id.* ¶ 138. Plaintiff stated that for his first three and a

half years at Columbia, he had never been accused of sexual misconduct; that given Defendant's

reliance upon allegations of Jane Does 1–3, Defendant should consider Plaintiff's evidence; that Defendant was forgetting that Plaintiff was a cross-complainant; and that he had paid for and successfully completed 3.7 years at Columbia. *Id.* He also denied engaging in sexual misconduct with Jane Does 1–3. *Id.* The evidence that Plaintiff submitted consisted of text messages between him and Jane Doe 3 which showed "that [Jane Doe 3] had legitimate romantic feelings toward [Plaintiff], was conflicted by the fact that [their] joint Christian faith did not condone extra-marital relationships, and . . . acknowledg[ed] that [they] both had difficulty avoiding such relationships with each other." *Id.*

On March 14, 2018, Ms. Fisher denied Plaintiff's appeal and sustained the interim suspension. *Id.* ¶ 139. Ms. Fisher asserted that she had considered the evidence Plaintiff had submitted, but nonetheless found that the interim suspension was "appropriate." *Id.* She acknowledged that the interim suspension was interfering with Plaintiff's ability to complete his studies and said that Columbia "would provide an alternate means of continuing his studies while suspended." *Id.*

On March 28, 2018, Plaintiff emailed Ms. Fisher, requesting reconsideration of his interim suspension because Columbia had been "unsuccessful in effectively balancing and implementing accommodations to ensure his academic progress." *Id.* ¶ 145. On March 30, 2018, Ms. Fisher replied:

> I think it is important to correct your mischaracterization of the fact that you are being permitted to continue making educational progress remotely and receive notes and take exams off campus as "accommodations." We have made a modification of your interim suspension from a full interim suspension from all academic and extracurricular activities (and restricting you from the campus as a whole), to a modified interim suspension with special alternative arrangements permitting you to receive notes, recordings and materials from your professors and take exams off campus in order to continue to make academic progress. This is still a form of interim suspension, based on the fact that you are involved in multiple pending Title IX investigations; this does not and should not enable you to get extra time, or to be given a take home exam when it would not ordinarily be given, or for you to take an exam at an alternative time from your fellow students.

. . . .

[Y]ou have made a renewed request that I "please revise your finding on the interim suspension and reverse your decision to allow me to continue my studies in accordance with Columbia's policies and Title IX." At this time, we will not reverse the decision to restrict your attendance in class, or your presence on campus, especially in light of the fact that since you were first placed on interim suspension there has been an additional case filed against [you]—for a total of four pending Title IX investigations.

*Id.*

Plaintiff completed his coursework and earned three As and one B+ on his final exams that

semester. *Id.* ¶ 156.

### 5. Adjudication of GBM Allegations

Repeatedly during the investigations of the Jane Doe cases, Plaintiff communicated his

concern that Columbia's investigators were not impartial. *Id.* ¶¶ 133, 142, 146, 149, 155. On May 1,

2018, Plaintiff's counsel sent a letter to Ms. Fisher objecting to Columbia's lack of fairness as to the

Jane Does 1–4 complaints; Columbia's failure to investigate Plaintiff's sexual misconduct claim

against Jane Doe 1; Jane Doe 3 being allowed to file an amended complaint materially changing her

allegations to side-step Plaintiff's evidence; the disparate treatment of men and women; and the

delay in providing Plaintiff with the specific allegations made by Jane Doe 4. *Id.* ¶ 151. On May 9,

2018, Mr. Fisher rejected Plaintiff's concerns. *Id.* ¶ 153.

### a. Plaintiff's Retaliation and Harassment Complaint Against Jane Does 1–3

On May 17, 2018, Kelly Joyce, Columbia's Senior Director of Student Conduct and

Community Standards, informed Plaintiff that the allegations in his complaint about retaliation and

harassment—leaking confidential information to *Bwog*, coming to Plaintiff's class and laughing, and

coordinating on the Title IX cases—"do not constitute violations of policy" and that Plaintiff "did

not experience significant impact to [his] work, education, or living conditions and, as such, the

behavior does not qualify as Harassment." *Id.* ¶ 154. Plaintiff had been "moved from his room,

suspended from clubs and campus, relegated to remote learning, barred from live participation in classes, deprived of recordings of classes and precluded from on-campus interviews, networking, and the like." *Id.* Plaintiff alleges that Columbia dismissed his complaint without asking Jane Does 1–4 a single question. *Id.* Columbia never provided Plaintiff with a report of the interviews it conducted or the material it reviewed to reach its decision to dismiss Plaintiff's complaint. *Id.*

### b. Jane Doe 1

On June 6, 2018, Columbia issued the investigation report in Jane Doe 1's case. *Id.* ¶ 157. The report made credibility determinations in favor of Jane Doe 1 and against Plaintiff, concluding that the oral sex described by Jane Doe 1 was not non-consensual and that Plaintiff's sexual intercourse with Jane Doe 1, while starting as consensual, at some point during the sexual intercourse became non-consensual. *Id.* Plaintiff alleges that in preparing the investigation report Columbia "relied upon hearsay as testimony and evidence, misconstrued testimony via editorializing, and [credited] plain false information." *Id.* ¶ 158. Columbia "also failed to consider objective evidence," such as "the photographic evidence of Jane Doe's kitchenette that she submitted." *Id.* Columbia also failed to consider that Jane Doe 1 may have had an ulterior motive in accusing Plaintiff, even though she had recently dated a member of Plaintiff's fraternity, had been dissatisfied with that relationship, and had been taken to formal by another member of Plaintiff's fraternity. *Id.*

As to Plaintiff's counter-complaint, the report concluded that Plaintiff was not incapacitated. *Id.* ¶ 157. Plaintiff alleges that that finding was "contrary to a medical expert opinion submitted by [Plaintiff]." *Id.* Plaintiff's "difficulties in recollection, instead of being considered in light of the expert medical evidence as reflective of incapacitation, were used to discredit John Doe while concocted tales were credited." *Id.* ¶ 159.

On June 26, 2018, Columbia held a hearing regarding Jane Doe 1's complaint. *Id.* ¶ 160. Plaintiff alleges that the hearing panel "was openly hostile to [Plaintiff] and essentially rubber

stamped the investigation report." *Id.* Plaintiff alleges that the panel "failed to consider the photographic evidence that corroborated John Doe's assertion of sexual exploitation." *Id.* The panel ruled that the oral sex as described by Jane Doe 1 was not non-consensual and that Plaintiff's sexual intercourse with Jane Doe 1, while starting as consensual, at some point became non-consensual. *Id.* Based upon the hearing panel decision, Cristen S. Scully Kromm, Columbia's Dean of Undergraduate Student Life, sanctioned Plaintiff with a two-year suspension. *Id.* On July 5, 2018, Ms. Kromm wrote to Plaintiff that the conferral of his degree would be delayed by two years and that "disciplinary suspension" would be added to his transcript. *Id.* ¶ 164.

On July 16, 2018, Plaintiff appealed the hearing panel decision and sanction in the Jane Doe 1 proceeding, arguing that the panel had made procedural errors and imposed an excessive sanction. *Id.* ¶ 165. On July 31, 2018, Plaintiff's appeal was denied. *Id.* ¶ 169.

Plaintiff alleges that he "suffered a serious psychological toll from dealing with the June 2018 Jane Doe 1 investigation report and hearing that had come in the wake of Columbia's March 2018 interim suspension, Columbia's May 2018 rejection of his retaliation and harassment complaint and Columbia's May 2018 denial of granting [Plaintiff his] diploma." *Id.* ¶ 161. He "felt under siege, was severely depressed and entertained suicidal thoughts as a result of the four sexual misconduct disciplinary cases in which he insisted he was not guilty." *Id.* Columbia failed to offer him counseling, and the case manager who Columbia assigned to him failed to communicate with him at all after February 5, 2018. *Id.* ¶ 162.

### c. Plaintiff's Expulsion for Email Hacking

On July 20, 2018, an investigation conducted as part of a "Dean's disciplinary process" found Plaintiff responsible for email hacking and retaliation. *Id.* ¶ 168. The investigation was conducted by Ms. Joyce, Columbia's Senior Director of Student Conduct and Community Standards. *Id.* On August 2, 2018, Ms. Joyce emailed Plaintiff informing him that, as a result of the

investigation's findings, the Dean had permanently expelled him.  *Id.* ¶ 170.  According to Plaintiff,

"the e-mail hacking would not have occurred but for the cumulative developments in the sexual

misconduct proceedings . . . and Columbia's deliberate indifference to [Plaintiff's] need for services."

*Id.*

On August 9, 2018, Plaintiff appealed the Dean's decision to expel him.  *Id.* ¶ 171.  On

August 29, 2018, his appeal was denied, finalizing the expulsion and preventing him from receiving

his degree.  *Id.* ¶ 174.  "Thereafter, the proceedings and decisions made in the two sexual

misconduct disciplinary proceedings against [Plaintiff] were in the context of [Plaintiff] having been

permanently expelled."  *Id.*

### d. Jane Doe 2

On August 29, 2018, the investigation report was issued in Jane Doe 2's case.  *Id.* ¶ 172.  The

report found that Plaintiff was not responsible for the sexual misconduct Jane Doe 2 alleged to have

occurred in April 2016.  *Id.*  Jane Doe 2 did not contest the result.  *Id.*  Despite the result in

Plaintiff's favor, Plaintiff alleges that the investigation team improperly "held against [Plaintiff] . . .

his request to know more about Jane Doe 2's allegations and speculated about his possibly having a

motivation to fabricate given the possible outcome and consequences."  *Id.* ¶ 173.

### e. Jane Doe 4

On October 18, 2018, the investigation report was issued in the Jane Doe 4 proceeding.  *Id.*

¶ 175.  The report found that Plaintiff had engaged in non-consensual sexual intercourse with Jane

Doe 4 on December 13, 2016.  *Id.*  During the investigation, Plaintiff "denied that Jane Doe 4 and

he had sexual intercourse on December 13, 2016, and stated that if they had, it was consensual."  *Id.*

Plaintiff alleges that the report "reached the conclusions it did despite Jane Doe 4's admitted lack of

independent memory of the evening of December 13, 2016," that "Columbia, by virtue of this

report, left Jane Doe 4's numerous assumptions about facts unexamined, whereas they ensured

everything [Plaintiff] said was corroborated or documented," and that Columbia "also included hearsay and gossip under the guise of testimony." *Id.* In a statement Plaintiff submitted to the hearing panel, Plaintiff argued that "text messages between me and [Jane Doe 4] indicate that I 'ceased the idea' of having sex that morning, which means we never had it." *Id.* ¶ 176. The investigative team was "quick to characterize" Plaintiff's statements as inconsistent but was "very forgiving of [Jane Doe 4]'s admitted lack of 'independent memory' of events just prior to inviting me to her room in the early morning hours of December 13, 2016." *Id.*

On October 31, 2018, Columbia held a hearing on Jane Doe 4's complaint. *Id.* ¶ 177. On November 5, 2018, Ms. Henry informed Plaintiff that the panel had found that he had engaged in non-consensual intercourse with Jane Doe 4. *Id.* ¶ 178. On November 9, 2018, Ms. Kromm wrote to Plaintiff that this violation warranted expulsion, but "because you have already been expelled . . . and your transcript reflects the notation of disciplinary expulsion, no further action will be taken at this time." *Id.* ¶ 179. Plaintiff appealed. On December 18, 2018, the appeal was denied. *Id.* ¶ 180.

### f. Jane Doe 3

On November 28, 2018, the investigation report was issued in the Jane Doe 3 proceeding. *Id.* ¶ 181. Jane Doe 3 had alleged five incidents of gender-based misconduct: (1) Sexual Assault—Intercourse on September 14, 2017; (2) Sexual Assault—Contact on September 28, 2017; (3) Dating Violence, Sexual Assault—Intercourse, and Sexual Assault—Contact on October 14–15, 2017; (4) Dating Violence on October 15–November 2, 2017; and (5) Sexual Assault—Intercourse and Sexual Assault—Contact on November 2, 2017. *Id.* The investigation report found Plaintiff responsible for Dating Violence, Sexual Assault—Intercourse, and Sexual Assault—Contact on October 14–15, 2017. *Id.* The investigation report found Plaintiff not responsible for the other violations alleged by Jane Doe 3. *Id.*

On January 17, 2019, Columbia held a hearing regarding Jane Doe 3's complaint.  *Id.* ¶ 183.
On January 23, 2019, the hearing panel echoed the findings of the investigation report.  It found
Plaintiff responsible for Dating Violence, Sexual Assault—Intercourse, and Sexual Assault—Contact
that occurred on October 14–15, 2017.  *Id.* ¶ 184.  The hearing panel found Plaintiff not responsible
for the other alleged violations.  *Id.*

Plaintiff submitted an appeal that he characterizes as "timely," although he does not specify
the date on which it was submitted.  *Id.* ¶ 185.  In his appeal, Plaintiff stated:

> [T]he panelists depart from their duty of impartiality to note that, "Considering the
> length of the relationship [months] and number of sexual acts [5] occurring within this
> period, it is reasonable [that Jane Doe 3] would mistake a date or confuse incidents."
> This assumption is not supported by anything other than personal opinion.  This
> assumption also effectively gives [Jane Doe 3] a "free pass" for her substantive
> inconsistencies.  Yet, this assumption is not equally provided to [Plaintiff] for minor
> discrepancies in my memory about events leading up to the incident at issue, years
> after the fact.
>
> . . . .
>
> Similarly, the hearing panel confirmed my characterization of [Jane Doe 3]'s
> narrative as inarticulate when it comes to "specific details and her lack of certainty as
> to dates," yet they went on to chastise me:  "[Jane Doe 3]'s account of the . . . specifics
> of what happened may not be clear enough to constitute a preponderance of the
> evidence that a violation occurred, but it is undeniable that misconduct occurred
> during your relationship."  The hearing panel's partiality clearly indicates that it *wants*
> to find me responsible for everything that they can.  When [Plaintiff] spoke at the
> hearing, the demeanor of the panelists throughout the hearing implied that they could
> barely be bothered to listen, and looked as if their minds were already made up.  The
> demeanor of the panelists during the meeting, and the tone of their letter reveal a deep
> antagonism toward me that is tantamount to a disqualifying degree of prejudice.
>
> . . . .
>
> [T]he report unfairly holds my memory to a more rigorous standard than it
> does with [Jane Doe 3]'s.  It also credits demeanor as a boon to her and her witnesses
> while my good demeanor, and of the witnesses I called, garnered no advantage.

*Id.* (all but the first, sixth, seventh, and tenth–thirteenth alterations in original).  On January
28, 2019, Ms. Kromm sent and emailed a letter to Plaintiff:

I find it frankly unconscionable that another case representing a similar pattern of behavior was brought to the attention of the University. I have serious concern regarding your complete lack of judgement and the continued nature of the disturbing pattern of behavior in which you engage. After reviewing your impact statement, I implore you to engage in more thoughtful self-reflection and/or seek counseling for your inexcusable behavior.

The analysis of this matter remains the same as stated in my previous letters to you. I have reviewed the file in its entirety and given careful consideration to the serious nature of this violation, as well as your prior disciplinary history, and have determined that the appropriate sanction in this matter is expulsion. However, because you have already been expelled from Columbia College and your transcript reflects the notation of disciplinary expulsion, no further action will be taken at this time.

As you know, expulsion is a permanent and complete separation from Columbia University and renders you ineligible to return at any time in the future. The decision to impose a disciplinary expulsion is an appropriate reflection of the seriousness of your behavior in contrast to our community's expectations and values. Unless there is a change to this determination through the appeal process, your disciplinary file will reflect that this matter resulted in expulsion. As a reminder, you remain persona non grata from all Columbia University property, and may only access campus property with prior and proper authorization.

*Id.* ¶ 186. Plaintiff characterizes the letter as "imperious" and argues that it "reflected gender bias in treating [Plaintiff] as an incorrigible serial rapist." *Id.* ¶ 187.

### 6. State Court Proceedings

Plaintiff brought Article 78 challenges in state court contesting two of the gender-based misconduct proceedings and the email hacking determination by Columbia. The Court takes judicial notice of the filings in those cases. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir.1998)).

In the first Article 78 case, *Doe v. Columbia Univ.*, No. 101688/2018, 2020 WL 999006 (N.Y. Sup. Ct. Jan. 6, 2020), Plaintiff challenged the Jane Doe 1 and email hacking proceedings. Plaintiff's

petition was dismissed on the merits.  *Doe v. Columbia Univ.*, 2020 WL 999006 NYSCEF 21, at *9.

The court in that case found that Columbia had (1) substantially complied with its GBM Policy in

adjudicating the Jane Doe 1 proceeding; (2) not improperly shifted the burden to Plaintiff in the Jane

Doe 1 proceeding; (3) not applied a different credibility standard to Plaintiff and Jane Doe 1 in light

of Plaintiff's incapacitation; and (4) shown by a preponderance of the evidence that Plaintiff violated

the GBM policy.  *Id.* at *5–7.  The court also found that Columbia's decision to expel Plaintiff was

not "arbitrary and capricious" because it did not "shock the conscience" in light of Columbia's

findings that Plaintiff had "violated Columbia's GBM Policy . . . and its Standards and Discipline

rules by hacking into another student's email account and sending a fraudulent email to Columbia's

Title IX Coordinator in an attempt to have another sexual assault complaint against him

withdrawn."  *Id.* at *8.

In the second Article 78 case, *Doe v. Columbia Univ.*, No. 153940/2019 (N.Y. Sup. Ct. Sept.

11, 2020), Plaintiff challenged the Jane Doe 4 proceeding.  Plaintiff dismissed that case with

prejudice.  *Id.*

## B.  Procedural History

Plaintiff filed his original complaint in this case on September 14, 2020.  Compl., Dkt. No.

14.  He brought seven Title IX causes of action against Columbia:  (1) erroneous outcome in

imposing the interim suspension; (2) selective enforcement in imposing the interim suspension; (3)

harassment in imposing the interim suspension; (4) erroneous outcome in the Jane Doe 1

proceeding; (5) selective enforcement in the Jane Doe 1 proceeding; (6) erroneous outcome in the

Jane Doe 4 proceeding; and (7) erroneous outcome in the Jane Doe 3 proceeding.  For each Count

in the Complaint, Plaintiff sought injunctive relief vacating his GBM disciplinary findings, granting

him a diploma, removing the disciplinary expulsion notation on his transcript, and enjoining future

violations of Title IX in re-adjudicating these incidents, as well as damages resulting from Plaintiff's

injuries to his reputation, educational and athletic opportunities, career prospects, physical, emotional, and psychological well-being, and other economic losses, as well as attorneys' fees and costs. Compl. ¶¶ 193–239.

Defendant filed a motion and supporting memorandum of law to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P 12(b)(6) for failure to state a claim. Dkt. No. 28. The Court granted in part and denied in part the motion to dismiss. Dkt. No. 34 (the "2021 Order"). The Court dismissed Plaintiff's claims for injunctive relief relating to his expulsion from Columbia and failure to obtain a Columbia diploma for lack of subject matter jurisdiction, finding both that Plaintiff lacked standing to pursue the claims and that the claims were moot. 2021 Order at 26–30. The Court also dismissed Plaintiff's selective enforcement and *Davis* harassment claims related to his interim suspension as insufficiently pleaded. *Id.* at 48–52. Finally, the Court dismissed Plaintiff's requests for injunctive relief arising from the Jane Doe 1 and Jane Doe 4 GBM proceedings as barred by res judicata, *id.* at 30–36, and dismissed Plaintiff's erroneous outcome claim as to the Jane Doe 1 proceeding as barred by collateral estoppel, *id.* at 52–53. The Court denied the motion to dismiss as to Plaintiff's remaining claims. *Id.* at 59–60. Plaintiff was given leave to amend his dismissed claims "to the extent they [were] not precluded under the doctrines of res judicata or collateral estoppel." *Id.* at 59.

Plaintiff filed his Amended Complaint on August 27, 2021. It contains the same seven Title IX causes of action and seeks the same relief as his original complaint. Am. Compl. ¶¶ 196–251. Defendant filed a motion to dismiss the Amended Complaint and an accompanying memorandum of law on October 7, 2021. Dkt. Nos. 46 ("Mot. To Dismiss"), 47 ("Def's Mem."). Plaintiff filed an

opposition to Defendant's motion on November 23, 2021.  Dkt. No. 52 ("Pl's Opp'n").  Defendant replied on January 7, 2022.  Dkt. No. 53 ("Reply").[2]

## II. DISCUSSION

### A.  Claims Previously Barred by Res Judicata and Collateral Estoppel

The 2021 Order denied Plaintiff leave to replead matters barred by res judicata and collateral estoppel.  2021 Order at 59.  Defendant moves to dismiss the aspects of Plaintiff's claims that the 2021 order found barred by those doctrines.  Def's Mem. at 6–7.

#### 1.  Legal Standard

Federal Rule of Civil Procedure Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave."  As a general matter, "[t]he court should freely give leave [to amend] when justice so requires."  *Id.*; *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").  But leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014); *see also* 6 Charles A. Wright & Arthur Miller, *Federal Practice and Procedure* § 1486 (approving the "numerous courts" that "have concluded that [Rule 15(a)(2)] gives them authority to impose conditions when permission to amend is allowed").

Given the Court's power to impose conditions on leave to amend, "[t]he power to dismiss claims that exceed a leave to amend stems from the Court's inherent authority" to enforce its orders.  *Bravo v. Established Burger One, LLC*, No. 12 Civ. 9044, 2013 WL 5549495, at *5 (S.D.N.Y. Oct. 8, 2013).  And pursuant to that authority, "[d]istrict courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the

---

[2] Columbia does "not challeng[e] any of the rulings in this Court's prior order" concerning claims that were allowed to proceed.  Reply at 3 n.2 (emphasis removed).  Accordingly, the Court will not address those claims again here.

plaintiff filed an amended complaint exceeding the scope of the permission granted." *Palm Beach Strategic Income, LP v. Salzman*, 457 F. App'x 40, 43 (2d Cir. 2012) (summary order) (citing *Pagan v. N.Y. State Div. of Parole*, No. 98 Civ. 5840, 2002 WL 398682, at *3 (S.D.N.Y. Mar.13, 2002); *Willett v. City Univ. of N.Y.*, No. 94 CV 3873, 1997 WL 104769, at *2 (E.D.N.Y. Feb.18, 1997); *Kuntz v. N.Y. State Bd. of Elections*, 924 F. Supp. 364, 367–68 (N.D.N.Y. 1996)).

### 2.  The 2021 Order

The 2021 Order granted Plaintiff leave to replead his dismissed claims except for those "precluded under the doctrines of res judicata or collateral estoppel." 2021 Order at 59. As the Court noted, futility is a reason leave to amend may be denied. *Id.*; *see TechnoMarine SA*, 758 F.3d at 505. And "[r]epleading matters precluded under the doctrines of res judicata or collateral estoppel would be futile." 2021 Order at 59; *see Harris v. N.Y. State Dept. of Health*, 202 F. Supp. 143, 175–76 (S.D.N.Y. 2002) (finding amendment of claims barred by res judicata and collateral estoppel, among other doctrines, futile).

The 2021 Order found two sets of claims were barred by res judicata or collateral estoppel. First, Plaintiff's "claims for injunctive relief arising from the Jane Doe 1 and Jane Doe 4 GBM proceedings [were] precluded by res judicata" because they had already been challenged in state-court actions. 2021 Order at 32. Second, Plaintiff's erroneous-outcome claim regarding the Jane Doe 1 proceeding was barred by collateral estoppel because Plaintiff had failed to respond to Defendant's arguments concerning estoppel, and thus had conceded the claim. *Id.* at 52–53.

### 3.  Application

Because Plaintiff's attempt to replead matters barred by res judicata and collateral estoppel is plainly beyond the scope of the Court's order, those claims remain dismissed.

In his Amended Complaint, Plaintiff continues to seek injunctive relief arising from the Jane Doe 1 and Jane Doe 4 proceedings. Am. Compl. ¶¶ 232, 234, 237, 239, 243, 245. He also continues

to plead an erroneous-outcome claim regarding the Jane Doe 1 proceeding. *Id.* ¶¶ 228–34. But the Court clearly explained that those aspects of Plaintiff's claims could not be repleaded. 2021 Order at 59. This Court's "inherent authority" to enforce its orders is sufficient to conclude affirm the uncontroversial proposition that Plaintiff's claims previously dismissed without leave to amend must stay dismissed. *Bravo*, 2013 WL 5549495, at *5; *see Palm Beach Strategic Income*, 457 F. App'x at 43 (2d Cir. 2012) (many courts in this circuit have dismissed claims "where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted").[3]

### B. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant has moved to dismiss for lack of subject matter jurisdiction Plaintiff's claims for injunctive relief relating to his expulsion from Columbia and failure to obtain a Columbia diploma. Def's Mem. at 7–12. The Court previously held that Plaintiff had failed to plead sufficient facts to establish his standing to pursue those claims. 2021 Order at 26–30. However, his amended pleading contains adequate factual allegations to clear the low bar required to establish standing at this stage of the proceedings.

---

[3] Plaintiff raises several arguments as to why this Court should reconsider its prior conclusions concerning res judicata and collateral estoppel. Pl's Opp'n at 5–12, 25. But those arguments would be properly addressed by a motion for reconsideration of the Court's rulings on those issues, not by an amended complaint. And as counsel for Plaintiff notes, Plaintiff chose to "withdraw [a previously filed] motion for reconsideration and deal with the issues in response to Columbia's anticipated motion to dismiss the Amended Complaint and then deal, if need be, with a motion for reconsideration." Dkt. No. 52, Decl. of Philip A. Byler ¶ 5. So Plaintiff's arguments concerning the *merits* of the 2021 Order's rulings on res judicata and collateral estoppel are not properly before the Court. But even if they were, Plaintiff has not convinced the Court that its prior rulings on these issues were erroneous. Plaintiff cites *Karamoko v. N.Y. City Hous. Auth.*, 170 F. Supp. 2d 372, 377 (S.D.N.Y. 2001), and *Davidson v. Capuano*, 792 F.2d 275, 280 (2d Cir. 1986), to challenge the Court's res judicata ruling. Pl's Opp'n at 25. Those are the exact two cases already distinguished on this issue in the 2021 Order, and the Court adheres to its prior view that "Plaintiff mischaracterizes both of those cases." 2021 Order at 35, *see id.* at 35–36 (explaining Plaintiff's improper reliance on those cases). As for collateral estoppel, Plaintiff points to a section of his original opposition papers where he discussed the federal-law standard for what constitutes irregularities in an adjudicative process. *See* Dkt. No. 32 at 29–38. On Plaintiff's telling, by simply discussing that federal-law standard, he impliedly contrasted federal law with state law and thus responded to Columbia's argument that prior state law proceedings estopped Plaintiff from pleading about the same Jane Doe proceedings. *See* Pl's Opp'n at 5–6. But Plaintiff's prior pleadings never once used the phrase "collateral estoppel" or otherwise alluded to the concept. They thus represented a failure to "oppose specific arguments in a motion to dismiss" that "result[ed] in waiver of those issues." *Arista Recs., LLC v. Tkach*, 122 F. Supp. 3d 32, 39 (S.D.N.Y. 2015) (quoting *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 456 F Supp. 2d 131, 152 (D. Me. 2006)).

### 1.  Legal Standard

#### a.  Rule 12(b)(1)

"A district court properly dismisses an action under Fed R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Courtland St. Recovery Corp. v. Hellas Telcomms., S.a.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Where, as here, "the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint . . . [t]he task of the district court is to determine whether the [complaint] allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. Healthport Techs, LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (third and fourth alterations in original) (internal quotations and citations omitted).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (emphasis removed) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  The Court must "accept[] as true all material factual allegations of the complaint, and draw[] all reasonable inferences in favor of the plaintiff." *Id.* at 57.

#### b. Article III Standing and Mootness

"Article III restricts federal courts to the resolution of cases and controversies . . . .  That restriction requires that the party invoking federal jurisdiction have standing—the personal interest that must exist at the commencement of the litigation." *Id.* (emphasis removed) (omission in original) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008)).  "This is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

"The 'irreducible constitutional minimum of standing consists of three elements':  the individual initiating the suit 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"  *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  The party seeking to invoke federal jurisdiction bears the burden of establishing each of these elements.  *See Spokeo*, 136 S. Ct. at 1547.

A party invoking federal court jurisdiction must have "standing" to sue "for each claim and form of relief sought."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 641 n. 15 (2d Cir. 2003)).  As the Supreme Court recently emphasized, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).  A Court may only provide proposed injunctive relief, for instance, if a plaintiff can demonstrate his entitlement to that specific relief.  *See Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020).

Finally, "even as to claims that plaintiffs originally had standing to assert, the court must determine whether those claims remain live controversies or have become moot."  *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001).  "If a claim has become moot prior to the entry of final judgment, the district court generally should dismiss the claim for lack of jurisdiction."  *Id.*

### i. Causation

"The traceability requirement for Article III standing means that the plaintiff must 'demonstrate a causal nexus between the defendant's conduct and the injury.'"  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992)).

Such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue.  However, while the "indirectness" of an injury "'may make it substantially more difficult'" to show the "fairly traceable" element of Article III standing, *i.e.,* "'to establish that, in fact, the

> asserted injury was the consequence of the defendants' actions," indirectness is "not necessarily fatal to standing," because the "fairly traceable" standard is lower than that of proximate cause. "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence."

*Id.* (citations omitted).

"The requirement that a complaint allege[] an injury that is fairly traceable to defendants' conduct . . . for [purposes of] constitutional standing is a lesser burden than the requirement that it show proximate cause." *Id.* at 92. (alterations in original) (internal quotation marks and citation omitted). The fact that there is an intervening cause of a plaintiff's injury is not necessarily a basis to find that the injury is not "fairly traceable" to a defendant's conduct, even if that intervening cause would foreclose a finding of proximate cause. *Id.* As a result, the Second Circuit has noted that "particularly at the pleading stage, the 'fairly traceable' standard is not equivalent to a requirement of tort causation' and that 'for purposes of satisfying Article III's causation requirement, we are concerned with something *less than the concept of proximate cause.*" *Id.* (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 346 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011)).

Accordingly, at the pleading stage of an action, "the plaintiff's burden . . . of alleging that their injury is 'fairly traceable' to the challenged act is relatively modest." *Id.* (internal quotations and citation omitted). To successfully plead the elements of Article III standing, "[i]t is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute . . . ." *Warth*, 422 U.S. at 518. The requirement that one clearly allege facts demonstrating standing "is a 'low[er] threshold' than that for 'sustaining a valid cause of action.'" *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018) (alteration in original) (quoting *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008)). Judge Kaplan evocatively captured the distinction in the pleading standard for standing as opposed to merits issues: "[T]he standard for Article III standing is not whether . . . the alleged injury is *plausibly* fairly traceable, but,

rather, whether the injury is *possibly* fairly traceable." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 156 (S.D.N.Y. 2018).

*ii. Mootness*

"Under Article III of the U.S. Constitution, [w]hen a case becomes moot, the federal courts lack subject matter jurisdiction over the action." *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (per curiam) (internal quotation marks and citation omitted). "Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies." *In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010). "A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Van Wie v. Pataki*, 267 F.3d 109, 113 (2d Cir. 2001) (internal quotation omitted). Mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (internal quotation omitted).

**2. The 2021 Order**

In the 2021 Order, the Court first found that Plaintiff's lacked standing to pursue his claims for injunctive relief relating to his expulsion from Columbia and failure to obtain a Columbia diploma because he had not sufficiently alleged that those injuries were traceable to Defendant. 2021 Order at 26–29. It noted that Plaintiff did not offer any theory in his original complaint to "link the GBM procedures and Columbia's alleged discrimination against him to his email hacking" for which he was expelled. *Id.* at 29. Plaintiff's attempts to raise that theory in his opposition papers, the Court explained, were barred by established precedent. *Id.* at 28 (citing *Fac., Alumni, & Students Opposed to Racial References v. New York Univ. L. Rev.*, No. 18 Civ. 9184, 2020 WL 1529311, at *7 (S.D.N.Y. Mar. 31, 2020) ("It is well established in this district that a plaintiff cannot amend his

30

pleadings in his opposition briefs.")).  So Plaintiff had "failed to meet even [the] low standard" at the motion-to-dismiss stage for pleading sufficient to demonstrate that Defendant's actions had caused his expulsion and diploma-related injuries, which divested the Court of subject matter jurisdiction over his claims for injunctive relief arising from those injuries.  *Id.* at 29.

The 2021 Order also found that Plaintiff's requests for injunctive relief stemming from his expulsion and lack of diploma were moot.  *Id.* at 29–30.  The Court noted that the same lack of connection between Defendant's complained-of actions and Plaintiff's email hacking that doomed Plaintiff's standing to sue also operated to moot the relevant claims.  *Id.* at 30.  It explained that "regardless of the outcome of this case, Plaintiff will remain expelled from Columbia and will continue to lack a Columbia diploma because Columbia found that he had engaged in email hacking."  *Id.*

### 3.  Application

Though it is an extraordinarily close call, Plaintiff's amended pleadings adequately allege causation to satisfy that element of Article III standing.  Additionally, the Court concludes that its prior application of the mootness doctrine to Plaintiff's claims was not the correct analytical framework through which to consider the effect of his expulsion.  Accordingly, Plaintiff has sufficiently pleaded standing to bring his injunctive relief claims related to his expulsion and lack of diploma.[4]

#### a.  Causation

At this motion-to-dismiss stage of the proceedings, Plaintiff has—barely—sufficiently pleaded that his expulsion and subsequent lack of diploma were caused by Defendant for purposes of establishing standing.  Plaintiff's Amended Complaint provides a causal link absent from his original pleadings:  He now alleges that "the e-mail hacking [for which Plaintiff was expelled] would

---

[4] These claims, however, are nonetheless barred by the application of res judicata.  *See* Part II(C)(3)(a), below.

not have occurred but for the cumulative developments in the sexual misconduct proceedings detailed above and Columbia's deliberate indifference to John Doe's need for services." Am. Compl. ¶ 170. This allegation creates an "inference linking his email hacking to Columbia's poor treatment of him in the GBM proceedings." 2021 Order at 29. And because Plaintiff was ultimately expelled (and denied a diploma) as a result of that hacking, his link between the GBM proceedings and his hacking complete the causal chain between those proceedings and the injury he asserts.

Plaintiff's causal link, to be sure, is thin at best: The claim that the GBM proceedings caused the hacking incident is the *only* allegation in Plaintiff's Amended Complaint that properly links Columbia's actions to his expulsion and lack of diploma. Plaintiff cannot challenge the proceedings themselves as having caused that injury because (a) he is barred, by res judicata, from repleading the issue of injunctive relief related to the Jane Doe 1 and Jane Doe 4 proceedings, *see supra* at 24–26, (b) no disciplinary action was taken as a result of the Jane Doe 2 proceeding, which found Plaintiff not responsible for sexual misconduct, Am. Compl. ¶ 172, and (c) Columbia did not take any disciplinary action related to the Jane Doe 3 and Jane Doe 4 proceedings because Plaintiff had already been expelled, *id.* ¶¶ 179, 186. So he is left with one allegation applicable to the causation analysis: that Columbia's conduct during GBM proceedings caused him to conduct the email hacking which led, in turn, to his expulsion and being denied a diploma.

Still, the Court finds that allegation is just enough to satisfy the "modest" showing of causation that a plaintiff must make against a motion to dismiss. *See Rothstein*, 708 F.3d at 92. Plaintiff need only show that the injury—his expulsion and lack of diploma—"is *possibly* fairly traceable" to Columbia's actions, not that it "is *plausibly* fairly traceable" to that conduct. *Dennis*, 343 F. Supp. 3d at 156. And whether or not Plaintiff's "Columbia made me do it" explanation for the hacking is plausible, the Court cannot say as a matter of law—while making inferences in Plaintiff's favor, as it must—that such a chain of events is not possible.

Defendant's contention that Plaintiff's Amended Complaint contains merely "conclusory allegation[s] that a causal link somehow exists" is therefore misguided. *See* Def's Mem. at 9. It is true that absent "factual allegations from which the Court can conclude that it is possible that" Defendants caused Plaintiff's injuries, the Court could not engage in "pure speculation" to find causation. *MSP Recovery Claims, Series LLC v. AIG Prop. Casualty Co.*, No. 20-cv-2102, 2021 WL 1164091, at *13 (S.D.N.Y. Mar. 26, 2021). But here, such speculation is unnecessary. Plaintiff has provided many facts alleging mistreatment in the GBM proceedings, including many that occurred before the email hacking. *See, e.g.*, Am. Compl. ¶¶ 126, 128–29, 131, 133, 137–39, 141–56. He now claims that he would not have engaged in that hacking but for the alleged mistreatment. *Id.* ¶ 170. And it is undisputed that he was expelled and lacks a diploma in part because of that hacking. *Id.* That chain of causation means that Plaintiff's injury is, at least, possibly traceable to Columbia's conduct. *See Dennis*, 343 F. Supp. 3d at 156.

Nor did Plaintiff's email hacking represent a purely self-inflicted injury that broke the chain of causation. "An injury is self-inflicted so as to defeat the causation necessary to establish standing, . . . 'only if . . . the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000)). By contrast, "[s]o long as the defendants have engaged in conduct that may have contributed to causing the injury, it would be better to recognize standing." *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015) (quoting *St. Pierre*, 208 F.3d at 402). Here, Plaintiff's own actions—his email hacking—did not "break the causal chain" between Defendant's challenged conduct (the GBM proceedings) and his asserted injury (expulsion and lack of diploma). *See Nat. Res.*, 710 F.3d at 85. To the contrary, the email hacking provides an essential link in that chain.

Defendant's invocation of *Bandler v. Town of Woodstock*, 832 F. App'x 733 (2d Cir. 2020), for the proposition that a plaintiff who chooses not to take certain actions to redress his own injury cannot show causation, is not on point.  Def's Mem. at 11–12 (citing *Bandler*, 832 F. App'x at 735). In *Bandler*, a plaintiff could not establish that his injury of paying a filing fee to the Vermont Superior Court was fairly traceable to that court's conduct because it was clear that he could have received reimbursement after the fact, but he chose not to.  832 F. App'x at 734–35.  But here, unlike in *Bandler*, Plaintiff cannot ameliorate his expulsion and lack-of-diploma injuries.  To be clear, Plaintiff could have—indeed, should have—chosen not to hack anyone's email.  But the injury Plaintiff raises is not the hacking but the expulsion and consequences from it; those consequences can be traced back to Defendant's conduct through the causal chain described above.  Though a remarkably close call, the Amended Complaint thus adequately pleads that Plaintiff's expulsion and diploma-related injuries are fairly traceable to Defendant's conduct because that conduct "may have contributed to causing the injur[ies]."  *Backer*, 788 F.3d at 344 (internal quotation omitted).

### b. Mootness

The 2021 Order's invocation of the mootness as a basis to bar Plaintiff's standing was mistaken.  Varied articulations of the mootness doctrine all express a similar, change-over-time theme:  Mootness occurs where a plaintiff had standing at the outset of a case, but—due to a change in circumstances—no longer does.  *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016) ("If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." (internal quotation omitted)); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." (internal citation omitted)); *Tann v. Bennett*,

34

807 F.3d 51, 52 (2d Cir. 2015) ("A case is moot when the issues presented are no longer 'live' or the parties 'lack a legally cognizable interest in the outcome.'" (internal quotation omitted)).

A necessarily corollary to mootness's basis in changed circumstances during litigation is that if a plaintiff never has standing in the first place, mootness does not apply. *See Trautz v. Weisman*, 846 F. Supp. 1160, 1164 (S.D.N.Y. 1994) (distinguishing the plaintiff's situation, where he "never had standing to sue for injunctive relief from the first day th[e] case was filed," from those where "named plaintiffs who had standing when their cases were filed" had later events "moot their individual claims"). For that reason, *Chafin v. Chafin*, 568 U.S. 165 (2013), and *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135 (2d Cir. 1994), are inapposite here. *But see* 2021 Order at 29 (relying on those cases in the mootness analysis). In *Chafin*, the Supreme Court noted that "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinion[s] advising what the law would be upon a hypothetical state of facts." 568 U.S. at 172 (internal quotations omitted). That case analyzed whether a child's return to a foreign country during the pendency of the case mooted a child-custody dispute. *Id.* at 173. The mootness question was therefore presented only due to a change in circumstances during the case. So too in *Fox*. There, the Second Circuit held that after plaintiff-students exited the SUNY system as their case progressed, "it becam[e] impossible for the courts, through the exercise of their remedial powers, to do anything to redress" their education-related injuries, and their case was therefore moot. *Fox*, 42 F.3d at 140. Like *Chafin*, *Fox* thus involved changed circumstances that transformed a once-live case into one over which federal courts no longer had Article III jurisdiction.

For the reasons explained in Part II(C)(3)(a) below, however, res judicata has precluded Plaintiff from pursuing injunctive relief related to his expulsion and lack of diploma from the outset of this litigation. Because there was no change during this case affecting Plaintiff's right to

injunctive relief stemming from expulsion and lack of diploma, those aspects of his requested relief are not properly described as mooted.[5]

### C. Motion to Dismiss for Failure to State a Claim Under Title IX

#### 1. Consideration of Documents Outside of the Parties' Pleadings

In the context of a motion to dismiss brought under Rule 12(b)(6), "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch*, 952 F.3d at 76. "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the

---

[5] It is arguable that Plaintiff has not established redressability under Article III. Part II(C)(3)(a) of this opinion outlines the Court's view that the Article 78 state court's denial of Plaintiff's request for certain injunctive relief bars—under res judicata—the Court from issuing that relief here, irrespective of additional Jane Doe proceedings he describes in this case that were not a part of the state-court action. Because the additional facts that Plaintiff raises either could have been raised in the state-court proceeding, or are irrelevant to the injunctive relief at issue, they cannot alter the determination that the injunctive relief Plaintiff seeks is barred by res judicata. *See* Part II(C)(3)(a), below.

But Plaintiff's complaint in this case could alternatively be seen as "nesting" a claim barred by res judicata (his claims for injunctive relief related to the Jane Doe 1 proceedings and the email hacking) within new, non-barred claims (the claims for the same relief, but as related to the Jane Doe 2 and Jane Doe 3 proceedings). If that's the right way to think about things, Plaintiff would still be barred for obtaining that relief, but by a lack of redressability rather than by res judicata. *See Lujan*, 504 U.S. at 561 (to demonstrate redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the [claimed] injury will be 'redressed by a favorable decision'") (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 42 (1976)). An analogous situation was presented in *Estate of Boyland v. United States Department of Agriculture*, 913 F.3d 117 (D.C. Cir. 2019), where male African-American farmers challenged, under Title VI and the Fifth Amendment, a framework for repaying Hispanic and female—but not African-American—farmers who were victims of USDA discrimination. 913 F.3d at 121–23. But the African-American farmers' underlying discrimination claims all occurred decades prior, and thus were either time-barred or precluded by the res judicata effect of a prior settlement between the USDA and African-American farmers. *Id.* at 124–27. So while the African-American farmers' Title VI and Fifth Amendment claims were not procedurally defaulted, their original discrimination claims were, which prevented the court from redressing their underlying injuries. *Id.* at 127.

Ultimately, because the Court finds that res judicata applies to bar Plaintiff's ability to pursue injunctive relief related to his expulsion and lack of diploma as to all of his claims, including those relating to Jane Doe 2 and Jane Doe 3, there is no non-procedurally barred claim in which his injunctive relief request is nested. And the Court is wary of turning "all procedural bars into standing issues" such that every finding of res judicata would preclude a showing of redressability as to that relief. *Id.*; *see also Grauman v. Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 289 (E.D.N.Y. 2021) (noting that because a Rule 12(b)(1) challenge to standing is "a challenge to the power of the court," it must be addressed before and independently from a Rule 12(b)(6) motion to dismiss for failure to state a claim). But it would certainly be possible to conclude that the bar on Plaintiff's attempt to achieve his requested injunctive relief is better conceptualized as a standing defect, rather than as a res judicata issue.

complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

 "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotations and citations omitted).  As the Second Circuit recently reaffirmed in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch*, 952 F.3d at 79 (citations omitted).

A court can also consider documents that are "integral to" the complaint.  In order for a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects.  *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effects, thereby rendering the document integral to the complaint.") (internal quotation marks and citation omitted).  "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.*  (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  "It also must be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*

As in the 2021 Order, the Court finds that Columbia's Gender-Based Misconduct Policy and Procedures are integral to the Amended Complaint because they are written instruments and Plaintiff relies heavily on their terms and effects.  *See* Dkt. No. 31 Ex. 1, Def's Br. in Supp. Ex. A (the "GBM Policy" or the "GBM").  As stated in the that order:

The GBM governs the conduct of the parties during the Title IX adjudication at issue here and Columbia's alleged violations of the GBM referenced pleaded repeatedly by Plaintiff in support of his Title IX claims. *See, e.g.*, [Am.] Compl. ¶ [138] (quoting the GBM, and stating, "Columbia took baseless allegations and ignored the text of its own policies in completely ending my ability to finish my studies. The interim suspension violates Columbia's policies and Columbia's representations to me as a student"), [146] ("Columbia was not adhering to [its] Policies regarding impartiality and conflicts of interest"); [151] ("I am writing to express my concern regarding Columbia University's . . . lack of adequate process, and inequitable enforcement of its policies regarding the charges [John Doe] is defending and prosecuting against [Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4] . . . Additionally, it appears that Columbia has failed to enforce its policy regarding false statements (p. 25) against [Jane Doe 3]" (all alterations but ellipsis in original)). The GBM is cited and quoted extensively. *See, e.g.*, *id.* ¶¶ [127, 130–131, 138, 167]. The GBM is a "written instrument" that "defines rights, duties, entitlements or liabilities." *See Lynch*, 952 F.3d at 79 (quoting *Black's Law Dictionary*). Plaintiff's reliance on the GBM in framing his claims makes these documents "integral" to the pleading. Plaintiff does not dispute the accuracy or authenticity of this document.

Courts have routinely considered such policy and procedure documents on motions to dismiss in the context of Title IX claims because they are integral to the complaint. *See, e.g.*, *Doe v. New York Univ.*, No. 1:20-cv-1343 (GHW), 2021 WL 1226384, at *15 (March 31, 2021) ("[T]he Policy and the Procedures are integral to the Amended Complaint because they are written instruments and Plaintiff relies heavily on their terms and effects."); *Feibleman v. Trs. of Columbia Univ.*, No. 19-cv-4327 (VEC), 2020 WL 882429, at *11 (S.D.N.Y. Feb. 24, 2020) ("Although the Complaint does not include the [Gender Based Misconduct Policy] as an attachment or expressly incorporate it by reference, the Court may nonetheless consider it because Plaintiff's reliance on the GBMP throughout the Complaint made it 'integral' to the pleading."); *B.B. v. The New School*, No. 17 Civ. 8347 (AT), 2018 WL 2316342, at *1–2, *2 n.3 (S.D.N.Y. Apr. 30, 2018) (considering the school's Sexual Misconduct & Violence Policy because the complaint "quotes from and relies on it"). Accordingly, the Court will consider Columbia's GBM Policy.

2021 Order at 41–43.

Additionally, Plaintiff has attached five exhibits to his Opposition to the motion to dismiss. *See* Pl's Opp'n. Because those exhibits were attached to his Opposition, and not to the Amended Complaint, the Court may only consider them if they are incorporated by reference in or integral to the Amended Complaint. *See DiFolco*, 622 F.3d at 111. Exhibits A and B are documents already on file with the Court concerning scheduling matters and are not mentioned in the Amended Complaint, so the Court will not consider them in evaluating the motion to dismiss. *See* Pl's Opp'n

Ex. A (letter filed at docket number 38), Ex. B. (transcript of August 26, 2021 proceedings filed at docket number 44).  Exhibits C, D, and E, however, are all incorporated by reference in the Amended Complaint and the Court will therefore consider them in the motion to dismiss.  *See id.* Ex. C (April 4, 2011 Dear Colleague Letter referenced at paragraphs 23–24, 26–27, 29, 31–41, 50–51, 53–54, 56, 79, and 74 of the Amended Complaint), Ex. D (September 7, 2017 remarks by then-Secretary of Education Betsy Devos referenced at paragraphs 69 and 70 of the Amended Complaint), Ex. E (September 22, 2017 Dear Colleague Letter referenced at paragraph 71 of the Amended Complaint).

Finally, the Court requested that the parties provide a copy "of an article posted on the website *Bwog* on February 6, 2018," that was deemed integral to Plaintiff's complaint.  Dkt. No. 57. The parties submitted various materials in response to that request.  *See* Dkt. Nos. 58–60.  The Court will consider the materials that can fairly be characterized as stemming from the article itself—that is, the article and comments appended or allegedly appended to it.  *See* Dkt. No. 58 Exs. A–E; Dkt. No. 59 Ex. A.

### 2.  Legal Standard

#### a.  Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)).  "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ." *Twombly*, 550 U.S. at 556 (internal citation omitted).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### b. Res Judicata

The doctrine of res judicata provides that

a valid, final judgment, rendered on the merits, constitutes an absolute bar to a subsequent action between the same parties, or those in privity with them, upon the

same claim or demand.  It operates to bind the parties both as to issues actually litigated and determined in the first suit, and as to those grounds or issues which might have been, but were not, actually raised and decided in that action.  The first judgment, when final and on the merits, thus puts an end to the whole cause of action.

*Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 108–09 (2d Cir. 2001) (quoting *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir. 1968)).  "Thus, the doctrine bars 'later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action.'" *EDP Med. Comput. Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (alteration in original) (quoting *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985)).  Res judicata "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Id.* (alterations in original) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

"In considering the preclusive effect of a state court judgment on a subsequent federal action, . . . [courts] usually consult the preclusion laws of the state in which the judgment was issued." *Hanrahan v. Riverhead Nursing Home*, 592 F.3d 367, 369 (2d Cir. 2010) (first alteration in original) (quoting *Nestor v. Pratt & Whitney*, 466 F.3d 65, 71 (2d Cir. 2006)); *see also Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) ("There is no doubt that 'a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984))); *Ferris v. Cuevas*, 118 F.3d 122, 125–26 (2d Cir. 1997) ("[W]e give preclusive effect to a state court judgment whenever the courts of that state would do so . . . .").  Accordingly, in determining the preclusive effect of the Article 78 proceedings, the Court will apply New York's preclusion laws.

New York "has adopted the transactional analysis approach in deciding *res judicata* issues. Under this [analysis], once a claim is brought to a final conclusion, all other claims arising out of the

same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981); *see also Simmons v. Trans Express Inc.*, No. 34, 2021 WL 2228828 (N.Y. June 3, 2021) (noting that the New York Court of Appeals has "consistently applied a 'transactional analysis approach' in determining whether an earlier judgment has claim preclusive effect"). "A cause of action arises from the 'same transaction' and is barred by the judgment in a prior proceeding 'where the same foundation facts serve as a predicate for each proceeding.'" *Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 28 (2d Cir. 1986) (quoting *Reilly v. Reid*, 45 N.Y.2d 24, 30 (1978)), overruled on other grounds by *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002). The New York Court of Appeals has followed the Restatement (Second) of Judgments in "analyzing 'whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Xiao Yang Chen v. Fischer*, 6 N.Y.3d 94, 100–01 (2005) (quoting Restatement (Second) of Judgments § 24(2)). "[W]hatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of res judicata." *Berlitz Schs. of Languages of Am., Inc. v. Everest House*, 619 F.2d 211, 215 (2d Cir. 1980).

### c. Title IX

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of gender in educational programs and activities that receive federal funds. The statute provides, with certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "This provision, which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in

universities." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (internal citation omitted).  As a result, "[c]ourts have interpreted Title IX by looking to . . . caselaw interpreting Title VII."  *Id.* at 55 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994)).

> Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline . . . .
>
> Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories.  In the first category, the claim is that the plaintiff was innocent and wrongly found to have committed an offense.  In the second category, the plaintiff alleges selective enforcement.  Such a claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.

*Yusuf*, 35 F.3d at 715 (citation omitted).  "In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of . . . discriminatory intent."  *Id.* at 713.

> Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.  If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail. . . .  However, the pleading burden in this regard is not heavy.  For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge.  A complaint may also allege particular procedural flaws affecting the proof.
>
>  . . . . A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.

*Id.* at 715.

In order to state a selective enforcement claim, a plaintiff must allege "that a school treated similarly situated members of the opposite sex—that is, members of the opposite sex facing comparable disciplinary charges—differently" and plead "specific facts that support a minimal plausible inference of . . . discrimination."  *Doe v. New York Univ.*, 438 F. Supp. 3d 172, 182 (S.D.N.Y. 2020) (citations omitted); *see also Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) ("To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a

female was in circumstances sufficiently similar to his own and was treated more favorably by the University." (alteration in original) (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003))).

A complaint under Title IX "alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a minimal plausible inference of such discrimination." *Columbia*, 831 F.3d at 56.   "[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) (emphasis in original).

In *Columbia*, the Second Circuit concluded that the plaintiff had adequately alleged that the hearing panel was motivated in its actions by "pro-female, anti-male bias." *Columbia*, 831 F.3d at 56. "Those alleged biased attitudes were, at least in part, adopted to refute criticisms circulating in the student body and in the public press that [the university] was turning a blind eye to female students' charges of sexual assaults by male students." *Id.*

The Second Circuit summarized the allegations that established gender bias in that case as follows:

> Both the investigator and the panel declined to seek out potential witnesses Plaintiff had identified as sources of information favorable to him. . . .  The investigator and the panel failed to act in accordance with University procedures designed to protect accused students.  The investigator, the panel, and the reviewing Dean, furthermore, reached conclusions that were incorrect and contrary to the weight of the evidence.
>
> . . . .
>
> . . . [D]uring the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. . . .  [T]he University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue.

*Id.* at 56–57 (footnote omitted).

Finally, under Title IX, educational institutions may be held liable for "deliberate indifference to known acts of harassment" perpetrated by one student against another. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). For a school to be held liable for such harassment, it must be "deliberately indifferent to sexual harassment, of which [it had] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. An educational institution is "deliberately indifferent to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648 (internal quotation omitted). And the harassment forming the basis for a Title IX claim must also be "gender-oriented." *Id.* at 651.

### 3. Application

In the 2021 Order, the Court held that the doctrine of res judicata barred Plaintiff from bringing claims for injunctive relief related to the Jane Doe 1 and Jane Doe 4 proceedings. 2021 Order at 32–36. The Court also dismissed Plaintiff's "selective enforcement claim regarding his interim suspension because none of the Jane Does 1–3 is a similarly situated student who was treated differently from Plaintiff." 2021 Order at 48. Finally, it dismissed Plaintiff's *Davis* harassment claim because Plaintiff had not "plausibly allege[d] any facts indicating that he was subject to harassment." *Id.* at 51.

### a. Res Judicata

The 2021 Order applied res judicata only as to "injunctive relief based on the Jane Doe 1 and Jane Doe 4 GBM proceedings." 2021 Order at 36. The Amended Complaint, however, shows

that the doctrine entirely precludes this Court from redressing Plaintiff's asserted injuries related to his expulsion and lack of diploma through injunctive relief.[6]

Plaintiff fully litigated his claims for injunctive relief related to his expulsion and lack of diploma in state court.  In late 2018, Plaintiff brought an Article 78 proceeding in New York state court, against Defendant, challenging his permanent expulsion stemming from Jane Doe 1's misconduct complaint and Plaintiff's email hacking.  *See Doe v. Columbia Univ.*, No. 101688/2018, 2020 WL 999006 (N.Y. Sup. Ct. Jan. 6, 2020). He asked the state court to "annul" the GBM decision, "issu[e] him a diploma, [and] expung[e] his disciplinary record." *Id.* *3.  The state court, however, granted Defendant's motion to dismiss Plaintiff's claims.  *Id.* at *9.  It walked through the same factual contentions presented here concerning the Jane Doe 1 proceedings and email hacking, and ultimately declined to overturn Defendant's judgment concerning the appropriateness of expulsion and withholding of Plaintiff's diploma.  *See id.* at *8.  Accordingly, this Court simply cannot grant Plaintiff the injunctive relief he seeks—"vacating" his disciplinary record, "granting" his diploma, and "expung[ing]" his transcript—without overturning the state-court decision in *Doe*. *See* Am. Compl. ¶¶ 202, 204, 210, 212, 225, 227, 232, 234, 237, 239, 243, 245, 249, 251.

Though it is true that this case—unlike the state-court action—involves allegations concerning the Jane Doe 2 and Jane Doe 3 proceedings, that makes no legal difference to Plaintiff's ability to pursue injunctive relief related to his permanent suspension and lack of diploma.[7]  The state court found that Plaintiff was permanently expelled (and lost his diploma) because he "violated Columbia's GBM Policy . . . after [Jane Doe 1] withdrew her consent and [violated Columbia's] Standards and Discipline rules by hacking into another student's email account and sending a

---

[6] While the parties did not brief the question whether res judicata operates to bar Plaintiff's injunctive relief related to his expulsion and lack of diploma in full, "res judicata is a waivable defense that a court is nonetheless free to raise *sua sponte.*" *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011).

[7] Any claims for injunctive relief pertaining to Jane Doe 4 are barred because they were precluded when Plaintiff dismissed a state-court proceeding concerning Jane Doe 4 with prejudice.  *See* 2021 Order at 34–35.

fraudulent email to Columbia's Title IX Coordinator in an attempt to have another sexual assault complaint against him withdrawn." *Doe*, 2020 WL 999006, at *8. In other words, the state court affirmed that Defendant lawfully expelled Plaintiff and withheld his diploma based on Plaintiff's email hacking and conduct regarding Jane Doe 1, independent of any other facts Plaintiff now brings before this Court.

Still, it is worth carefully explaining why res judicata precludes Plaintiff's requested injunctive relief despite his current allegations concerning the Jane Doe 2 and Jane Doe 3 proceedings. Plaintiff was found not responsible for misconduct in the Jane Doe 2 proceedings, and Columbia expressly declined to take any disciplinary action related to the Jane Doe 3 proceedings. Am. Compl. ¶¶ 172 (Jane Doe 2), 186 (Jane Doe 3). So the only way in which Plaintiff connects the Jane Doe 2 and Jane Doe 3 proceedings to the reasons that Columbia expelled him—the Jane Doe 1 proceedings and the email hacking—is by alleging that "the e-mail hacking would not have occurred but for the cumulative developments in [all of] the sexual misconduct proceedings," including those concerning Jane Doe 2 and Jane Doe 3. Am. Compl. ¶ 170. But because Plaintiff challenged his expulsion and related disciplinary action in the Article 78 proceeding, he could have raised that rationale for his email hacking as a defense in that case—and this Court cannot disturb the state court's judgment because of facts that could have been raised there. *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020) ("[C]laim preclusion prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated."). Any *other* allegations concerning the Jane Doe 2 and Jane Doe 3 proceedings in Plaintiff's Amended Complaint are unrelated to the expulsion and lack of diploma, either because they occurred after the expulsion or were not connected to that disciplinary action. As those alleged facts have no bearing whatever on the causes of Plaintiff's permanent expulsion, they necessarily

cannot show that Plaintiff is entitled to injunctive relief through claims against Jane Doe 2 and Jane Doe 3.

Put differently, res judicata precludes this Court from granting Plaintiff's injunctive relief related to his expulsion and lack of diploma because the relevant "factual predicate upon which" the claims regarding that relief are based—the Jane Doe 1 proceedings and email hacking—"are substantially identical" between the state court proceedings and this case. *Berlitz*, 619 F.2d at 215; *compare Doe*, 2020 WL 999006 at *1–3 (describing the GBM process with regard to the Jane Doe 1 allegations and the email hacking), *with* Am. Compl. ¶¶ 108–16, 157–71.  And the Article 78 court was empowered, had it found in Plaintiff's favor, to grant him his requested injunctive relief.  *See Doe*, 2020 WL 999006, at *3; *see Karamoko v. N.Y. City Hous. Auth.*, 170 F. Supp. 2d 372, 378–79 (S.D.N.Y. 2001) (finding that a previous Article 78 proceeding "preclude[s] . . . claims for injunctive and declaratory relief" because "claims for injunctive relief"—unlike some damages claims—can be brought in Article 78 courts).  The state court's decision was thus a final one on the merits, issued by a court of competent jurisdiction, in a case involving the same parties and the same cause of action—thereby satisfying the requirements of res judicata.  *EDP Med. Comput. Sys.*, 480 F.3d at 624.

It is irrelevant to the res judicata analysis that there are different legal tests in Article 78 and Title IX misconduct-related proceedings.  Plaintiff correctly notes that Article 78 courts and federal courts impose divergent standards for evaluating the discipline imposed by a university in response to sexual-misconduct allegations.  *Compare Doe*, 2020 WL 999006, at *8 (evaluating Columbia's actions under an "arbitrary and capricious" standard), *with Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) (holding that "where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a

*prima facie* case of sex discrimination" under Title IX). But while that would matter if this Court could evaluate Plaintiff's request for injunctive relief on the merits, it is irrelevant to the res judicata consideration. Res judicata turns simply on whether Plaintiff's claims in the previously determined action and new case are formed on the same factual predicates and otherwise meet the finality, competency, and privity requirements of the doctrine—regardless of what legal standard applies to the claims. *EDP Med. Comput. Sys.*, 480 F.3d at 624.

Applying the preclusive effect of the state-court judgment to Plaintiff's claims here, despite the different legal standard Plaintiff identifies, is the necessary result of deliberate litigation choices. Plaintiff chose to proceed in state court, thereby assuming the risk that "the decision to seek state court review could be a costly one." *Bray v. N.Y. Life Ins.*, 851 F.2d 60, 64 (2d Cir. 1988). And at bottom, barring Plaintiff's claims for injunctive relief arising from his expulsion is "the result required by New York law, which governs with respect to the issue of the preclusive effect to be given to the prior state court decision." *Karamoko*, 170 F. Supp. 2d at 377–78. To grant Plaintiff's requested injunctive relief would override the state court's final adjudication of that issue.

### b. Selective Enforcement in Imposing Interim Suspension

Plaintiff's Amended Complaint again fails to state a selective enforcement claim regarding his interim suspension because none of Jane Does 1–3 is a similarly situated student who was treated differently from Plaintiff.

As the Court noted in the 2021 Order, "'similarly situated members of the opposite sex' mean[s] 'members of the opposite sex facing comparable disciplinary charges.'" 2021 Order at 48–49 (quoting *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 182 (S.D.N.Y. 2020)); *see also Yu*, 97 F. Supp. 3d at 480 ("To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University."). The key issue is what constitutes comparable disciplinary discharges or circumstances

that are sufficiently similar to support a selective enforcement claim; given the dearth of law in the

Title IX context in the Second Circuit, the Court again looks to Title VII case law.

The Court outlined that law in its 2021 Order:

> To assert a Title VII claim, a plaintiff must allege that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). "The plaintiff's and comparator's circumstances must bear a 'reasonably close resemblance,' but need not be 'identical.'" *Id.* (quoting *Graham*, 230 F.3d at 40). In the context of employee discipline, courts consider whether the comparators' offenses were of "comparable seriousness," which "requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated." *Graham*, 230 F.3d at 40. "Ordinarily, '[w]hether two employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss." *Brown*, 756 F.3d at 230 (alterations in original) (quoting *Graham*, 230 F.3d at 39). On a motion to dismiss, a court must "determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 436 (S.D.N.Y. 2019) (quoting *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 319 (S.D.N.Y. 2014)).

2021 Order at 49–50.

In his amended pleadings, Plaintiff renews his argument that Jane Does 1–3 are similarly

situated students of the opposite sex who were treated better than Plaintiff because they were not

subject to interim suspensions. Plaintiff argues that for purposes of the similarly situated analysis, he

should be compared against Jane Doe 1, Jane Doe 2, and Jane Doe 3 individually, because they each

faced a counter-complaint from Plaintiff and thus "were each, on an individual basis, a comparator

to [Plaintiff]." Pl's Opp'n at 14. This is an identical argument, in all material respects, to the

argument in Plaintiff's original briefing that "those Jane Does are similarly situated to Plaintiff

'because they were the subject of Plaintiff's counter-complaint.'" 2021 Order at 48 (quoting Dkt.

No. 32 at 38). But that argument was erroneous the first time it was made, and it remains erroneous

now.

The relevant metric for comparing Plaintiff to Jane Does 1–3 is not whether they filed complaints against each other, but instead the overall severity of the allegations each individual faced. And the severity of the allegations against Jane Does 1–3 did not "bear a reasonably close resemblance" to those faced by Plaintiff when Plaintiff was given an interim suspension. *Brown*, 756 F.3d at 230 (internal quotation omitted). At that time, Jane Does 1–3 each faced one harassment complaint; Plaintiff faced three. Columbia was entitled to take that material difference into account as it imposed discipline. Because Plaintiff's Amended Complaint does not show that Jane Does 1–3 were "in circumstances sufficiently similar to [Plaintiff's] and [were] treated more favorably by the University[,]" no jury could plausibly determine that any of Jane Does 1–3 and Plaintiff are similarly situated. *Yu*, 97 F. Supp. 3d at 480. Accordingly, Plaintiff's claim for selective enforcement in imposing the interim suspension remains dismissed.[8]

### c. *Davis* Harassment in Imposing Interim Suspension

Because Plaintiff's Amended Complaint does not plausibly allege that Columbia was deliberately indifferent to any gender-oriented harassment, Plaintiff's *Davis* harassment claim will also remain dismissed.

Read liberally, Plaintiff's Amended Complaint and supporting exhibits make four primary allegations concerning peer-to-peer harassment. First, in an apparent reference to the complaints against him, Plaintiff states that he—as a "male"—was "falsely accused of being a rapist by females." Am. Compl. ¶ 216. Second, Plaintiff alleges that Jane Doe 1 and Jane Doe 2 both provided "confidential and defamatory information" to the student-run website *Bwog* concerning their ongoing misconduct cases against Plaintiff, and that such disclosures violated the confidentiality of

---

[8] As the Court noted in its 2021 Order, Plaintiff has stated a minimal plausible inference of gender bias as required to satisfy the second part of a selective-enforcement claim. 2021 Order at 50. But because he has not sufficiently alleged a similarly situated student who was treated better than he was, he has not satisfied the first part of that claim, and the claim therefore remains dismissed.

the GBM proceedings. *Id.* ¶ 214, 217. Third, Plaintiff alleges that as a result of that "leaking," an article was published in February 2018 on *Bwog* identifying a "respondent in a Title IX investigation into allegations of rape . . . that [was] generally recognized to be about [Plaintiff]." *Id.* ¶¶ 214–15, Dkt. No. 58 Ex. D. Finally, Plaintiff alleges he "was called a 'rapist' and [was] 'doxxed'" in the comments to that article. Am. Compl. ¶ 216, Dkt. No. 58 Ex. D. Plaintiff's name was listed in several comments, and some of the clubs in which he participated were noted. Am. Compl. ¶ 127, Dkt. No. 58 Exs. A–C. Plaintiff claims that "owing to the [*B*]*wog* story" and the appended comments, he "was socially ostracized, generally, and in particular, was compelled to resign from clubs and his fraternity out of fear of bad publicity." Am. Compl. ¶ 219; *see also id.* ¶ 127 ("Plaintiff suffered reputational and psychological harm.").

Several parts of Plaintiff's harassment allegations are clearly not gender-based, and so Columbia cannot be held liable for them under Title IX. *See Davis*, 526 U.S. at 648 (holding that educational institutions "may be liable for their deliberate indifference to known acts of peer *sexual* harassment" (emphasis added)). The accusations by Jane Does 1–4 do not constitute gender-based harassment because accusing someone of rape is not inherently gendered, as "[p]ersons of any gender may be perpetrators, or victims, of sexual assault." *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 365 n.8 (S.D.N.Y. 2016). Nor was Jane Doe 1–2's disclosure of their complaints to *Bwog* plausibly alleged to have been gender-based, as opposed to motivated by personal animus towards Plaintiff (based either on rape, as they claim, or on an orchestrated campaign against Plaintiff, as he claims). *Id.* at 365–66 (noting that activism by a woman against the individual she accused of raping her was motived by "*his conduct* toward her," not "*his status* as a male"); *see also Roe v. St. John's Univ.*, No. 19-cv-4694, 2021 WL 1224895, at *20 (E.D.N.Y. Mar. 31, 2021) (finding that a Tweet accusing a student of rape was "based on Plaintiff's alleged past conduct, not his gender"). And "[p]ersonal animus is not gender-based harassment, and cannot form the basis for a Title IX violation."

*Nungesser*, 169 F. Supp. 3d at 366; *see also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (affirming dismissal of Title IX claim where there was "nothing in the record to suggest" that the harasser "was motivated by anything other than personal animus"). Finally, the *Bwog* article, which noted that "a member of the Student Governing Board leadership (SGB) is currently under investigation by the Student Conducts and Community Standards (SCCS) office for multiple allegations of sexual assault" including "an alleged rape," was plainly not gendered harassment; it was instead a measured reporting of news by a campus arm of the free press. Dkt. No. 58 Ex. D. Though Plaintiff concludes that this conduct was gender-based, allegations that merely track the elements of a claim are insufficient to survive a Rule 12(b)(6) motion to dismiss. *See Iqbal*, 556 U.S. at 678.

Nor can Columbia properly be held liable for Plaintiff's final piece of harassment evidence—the comment appended to the *Bwog* article labelling him a "rapist." Dkt. No. 58 Ex. D.[9] For purposes of a *Davis* claim, educational institutions are deliberately indifferent of gendered harassment "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." 526 U.S. at 648. As this Court has previously noted:

> This is not a "mere reasonableness standard." Title IX does not require schools to "remedy peer harassment" or to "ensure that students conform their conduct to

---

[9] It is far from clear that even the term "rapist," as used in the identified blog comment, is properly considered gender-based. The Court has assumed in the past and again "accepts for the purposes of this motion that the term[] 'rapist' . . . constitute[s] [a] gendered slur[] in some circumstances." *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 364 (S.D.N.Y. 2017); *see also Doe v. Univ. of Chi.*, No. 16-C-8298, 2017 WL 4163960, at *7 (N.D. Ill. Sept. 20, 2017) (positing that while "sexual-assault accusations on their own are not inherently gendered," calling a man a "male rapist pig" might be gender-based harassment). Here, there are some indicia from the full comment—"[t]his guy's a known rapist and creep"—that the term "rapist" was used in a gendered manner. Dkt. No. 58 Ex. D. The comment uses the term "guy," which is a well-known synonym for a man. It also calls the alleged perpetrator identified in the *Bwog* article a "creep," a pejorative term that—to the Court's knowledge—is used much more frequently to describe men than women. On the other hand, the comment could still be read to criticize conduct—rape and "creeping"—rather than gender, and thus might fairly apply to a woman (who is a rapist and a creep) as well as to a man. In any event, the Court need not decide whether rapist was used in a gendered way in the blog comment because Plaintiff has not plausibly alleged that Columbia reacted to it in a clearly unreasonable manner; indeed, he has not alleged that Columbia knew of the comment by a reader of the article at all.

certain rules.  On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable."

*Nungesser*, 244 F. Supp. 3d at 362 (quoting *Davis*, 526 U.S. at 648–49).  Here, Plaintiff does not allege that Columbia had any knowledge, during the relevant time period, of the comment accusing him of being a "rapist."  *See* Am. Compl. ¶ 126 (alleging the Plaintiff notified Columbia that the *Bwog* article was set to be published, but not mentioning any follow-up concerning comments to the article). And it would be untenable to hold educational institutions liable for any and every comment about a student on a blog post, news article, or similar item, even if, as here, they are not alleged to have been known to the institution.  Internet comments—hurtful as they often are—represent a modern form of the "teasing and name-calling among school children" that is, for better or worse, a ubiquitous aspect of attending college today.  *Davis*, 526 U.S. at 652.  Columbia's failure to respond to a single internet comment, that Plaintiff does not allege Columbia had any knowledge of, was not "clearly unreasonable" and thus cannot form the foundation for Plaintiff's *Davis* claim.

## III.  CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED as to all of Plaintiff's previously dismissed claims.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 46.

SO ORDERED.

Dated:  September 28, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge